1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      EASTERN DIVISION

4

5      UNITED STATES OF AMERICA,

6              Plaintiff,

7          vs.                      CASE NO.:  3:18-cr-00342-WKW

8      KYLE GEOFFREY SANDLER,

9              Defendant.

10             * * * * * * * * * * * * * * *

11                    REVOCATION HEARING

12             * * * * * * * * * * * * * * *

13             BEFORE THE HONORABLE W. KEITH WATKINS, UNITED

14     STATES DISTRICT JUDGE, at Montgomery, Alabama, on Tuesday,

15     October 11, 2022, commencing at 2:58 p.m.

16                      APPEARANCES

17

18     FOR THE GOVERNMENT:     Mr. Mark Andreu
                               UNITED STATES ATTORNEY'S OFFICE
19                             Middle District of Alabama
                               131 Clayton Street
20                             Montgomery, Alabama 36104

21

22     FOR THE DEFENDANT:      Mr. Sam Brooke
                               FEDERAL DEFENDER'S OFFICE
23                             817 South Court Street
                               Montgomery, Alabama 36104

24
                     Proceedings reported Stenographically;
25                    transcript produced by computer

1                              EXAMINATION

2

3    JELESA JOHNSON

4        DIRECT BY MR. ANDREU                              9
         CROSS BY MR. BROOK                               19
5

6    JELESA JOHNSON

7        DIRECT BY MR. ANDREU                             30
         CROSS BY MR. BROOKE                              68
8        REDIRECT BY MR. ANDREU                           78

9

10   RENA ROSS

11       DIRECT BY MR. BROOKE                             82
         CROSS BY MR. ANDREU                              87
12

13

14       (The following proceedings were heard before Honorable W.

15       Keith Watkins, United States District Judge, at

16       Montgomery, Alabama, on Tuesday, October 11, 2022,

17       commencing at 2:58 p.m.)

18       (Call to order of the Court.)

19            THE COURT:  This is United States versus Kyle Geoffrey

20   Sandler, 18-cr-342.  Let's take appearance for the Government

21   first.

22            MR. ANDREU:  Good afternoon, Your Honor.  Mark Andreu

23   for the United States.

24            THE COURT:  Afternoon.  And for the defendant?

25            MR. BROOKE:  Good afternoon, Judge.  Sam Brooke with

```
 1   Mr. Sandler.
 2            THE COURT:  Good afternoon.
 3            Good afternoon, Mr. Sandler.
 4            THE DEFENDANT:  Good afternoon, Your Honor.  Thank you
 5   for seeing me.
 6            THE COURT:  Mr. Sandler, if you and Mr. Brooke would
 7   come to the podium -- or you can stand there at the table just
 8   speak so that I can hear you.
 9            Mr. Sandler, where are you housed right now?
10            THE DEFENDANT:  I'm currently housed at the
11   Montgomery County Detention Facility.
12            THE COURT:  In the federal pod?
13            THE DEFENDANT:  Yes, sir.
14            THE COURT:  Before I swear you in, I always -- my
15   practice -- to ask these questions, and then I will swear you
16   in and ask them again.  Are you under the influence of any
17   drugs or alcohol this afternoon?
18            THE DEFENDANT:  No, sir.  I don't do drugs or alcohol.
19   Period.
20            THE COURT:  Has anyone threatened you or promised you
21   anything to get you to plead one way or the other to these
22   violations?
23            THE DEFENDANT:  No, sir.
24            THE COURT:  So in a moment when I ask you how you
25   plead -- whatever your plea is -- is going to be voluntarily
```

1  entered by you of our own freewill without any influence from

2  the outside other than talking to your lawyer; correct?

3          THE DEFENDANT:  That is correct, Your Honor.

4          THE COURT:  All right.  So if you would, raise your

5  right hand to be sworn as best you can?

6      (At which time, the defendant was sworn in.)

7          THE COURT:  All right.  Mr. Sandler, you're housed at

8  the Montgomery County Detention Facility; is that correct?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  In the federal pod?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  And are you under the influence of any

13  drugs or alcohol today?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  Has anyone made you a promise or

16  threatened you to get you to enter a plea to these violations

17  one way or the other?

18          THE DEFENDANT:  No, sir.

19          THE COURT:  So in a moment when I ask you how you

20  plead, your plea is going to be of your own free involuntary

21  will -- and voluntary -- not involuntary -- but and voluntary

22  will after having consulted with your lawyer; correct?

23          THE DEFENDANT:  Correct, Your Honor.

24          THE COURT:  All right.  Mr. Andreu, would you please

25  summarize the violations we're here on?

```
 1              MR. ANDREU:  Yes, Your Honor.  Document Number 98
 2    U.S. probation officer, Jelesa Johnson, petitioned the Court.
 3    This is a recount petition.  Allegation of Violation Number 1
 4    is that -- makes an allegation based on the mandatory condition
 5    that the defendant must pay the total criminal monetary
 6    penalties under the schedule of payments.  The allegation is
 7    that on March 26, 2019, Mr. Sandler was ordered to pay
 8    restitution in the amount of approximately $1.9 million, that
 9    he failed to make monthly payments as ordered, and his payments
10    are currently in a delinquent status.  The allegation is that
11    Mr. Sandler is currently $1,000 in arrears towards restitution.
12              Violation Number 2, which deals with standard
13    condition Number 8 states that if the defendant knows someone
14    who has been convicted of a felony, he must not knowingly
15    communicate or interact with that person without first getting
16    the permission of the probation officer.  The allegation is
17    that on May 11, 2022, Mr. Sandler was instructed to cease all
18    contact with Cody Ayers, who is a convicted felon.  Since that
19    directive, Mr. Sandler has maintained consistent contact with
20    Mr. Ayers as revealed by multiple screenshots of messages.
21              Violation Number 3 deals with standard condition of
22    supervision Number 13, which states that the offender must
23    follow the instructions of the probation officer related to the
24    conditions of supervision.  The allegation is that on
25    August 10, 2022, Mr. Sandler was instructed to terminate all
```

1    business interests with Razor Wire Media as it pertains to

2    paralegal services, criminal justice reform, and prison

3    consulting.  Additionally, a court order was issued on

4    August 11, 2022 directing Sandler to cease his consulting and

5    paralegal business as directed by his probation officer.  On

6    August 12, 2022, Mr. Sandler contacted a customer -- the

7    initials D. H. -- via Facebook direct message and arranged a

8    meeting to assist with completing a motion.

9            THE COURT:  Mr. Brooke, is that a fair summary of the

10    three violations?

11            MR. BROOKE:  It is, Your Honor.

12            THE COURT:  All right.  So, Mr. Sandler, first of all,

13    how do you plead to Violation Number 1, the restitution

14    violation?

15            THE DEFENDANT:  Your Honor, on Number 1, I plead not

16    guilty.

17            THE COURT:  On Number 2, violation of Condition A,

18    communicating with a known felon against the May 11 order of

19    your probation officer, how do you plead?

20            THE DEFENDANT:  I plead guilty.

21            THE COURT:  All right.  And Number 3, failure to

22    follow instructions of the probation officer, how do you plead

23    to that?

24            THE DEFENDANT:  Guilty, Your Honor.

25            THE COURT:  All right.  So we have a plea of not

1  guilty on restitution and the guilty on two conditions, the

2  Number 2 violation and Number 3 violation.  On your plea of

3  guilty as to Number 2 and Number 3 violations, I find you

4  guilty and find that your plea is entered freely and

5  voluntarily after consultation with your counsel.  The Court

6  notes your counsel is very experienced in this, and so I will

7  accept your plea as to those two.

8          Now, as to the restitution, not guilty, does the

9  Government have evidence?

10          MR. ANDREU:  Yes, Your Honor.

11          THE COURT:  All right.  You-all may be seated,

12  Mr. Brooke, Mr. Sandler.

13          And call your witness on Violation Number 1.

14          MR. ANDREU:  Your Honor, if I could just be clear

15  before I start, the Government -- the Government will also have

16  evidence relating to sentencing as to Violations 2 and 3.  At

17  this point, we're just dealing with the guilt phase for

18  Violation Number 1?

19          THE COURT:  I need to do a calculation I think --

20  maybe -- first before we go into what we're -- the allocution

21  and all of that.  So let's just keep the testimony right now

22  just to the restitution.

23          MR. ANDREU:  Yes, sir.

24          THE COURT:  You can call the witness back if you need

25  to.

1          MR. ANDREU:  Yes, sir.  The Government would call

2    Probation Officer Jelesa Johnson.

3          THE COURT:  Come on up, Ms. Johnson.

4        (At which time, the witness was sworn in.)

5          MR. ANDREU:  May I proceed?

6          THE COURT:  You may.

7          MR. ANDREU:  Actually before proceeding with

8    testimony, for this portion of the hearing, the Government has

9    three exhibits, which have been premarked as Government's

10   Exhibits 1, 2, and 3.  I've provided a copy to defense counsel.

11   At this time, the Government would seek to introduce

12   Government's Exhibits 1, 2, and 3.

13         THE COURT:  Mr. Brooke, is there any objection?

14         MR. BROOKE:  No objection, Your Honor.

15         THE COURT:  All right.  They're admitted without

16   objection, Government's Exhibits 1, 2, and 3.  And I have a

17   copy up here.  But you do need to turn in a copy for the

18   official record at some point.

19         MR. ANDREU:  Yes, sir.  May I approach?

20         THE COURT:  You may.

21         MR. ANDREU:  And may I also approach the witness?

22         THE COURT:  You may.

23

24              **JELESA JOHNSON,**

25         The witness, having been duly sworn to speak the

1  truth, the whole truth and nothing but the truth, testified as

2  follows:

3

4                      DIRECT EXAMINATION

5  BY MR. ANDREU:

6  Q.   Good afternoon, ma'am.

7  A.   Good afternoon.

8  Q.   Would you please state your name for the record?

9  A.   Jelesa Johnson.

10  Q.   Officer Johnson, where are you employed?

11  A.   With United States Probation Office in the Middle District

12  of Alabama.

13  Q.   What is your occupation with the United States Probation

14  Office?

15  A.   I am a supervising United States Probation Officer in the

16  post-conviction unit.

17  Q.   How long have you been so employed?

18  A.   I've been with the United States Probation Office almost

19  six years.

20  Q.   What are your general duties?

21  A.   Generally now it is to supervise a caseload of

22  approximately 50 individuals, making sure that they abide by

23  the mandatory standard and Special Conditions ordered by the

24  Court.

25  Q.   As part of those duties, did you begin supervising

1    Mr. Kyle Sandler?

2    A.    I did.

3    Q.    And did you do that on approximately February -- did you

4    begin that supervision on approximately February 16 of 2022?

5    A.    I did.

6    Q.    What was Mr. Sandler originally convicted of?

7    A.    Mr. Sandler was originally convicted of wire fraud and

8    securities fraud.

9    Q.    And when you began supervising him, would that have been

10   after his release from prison?

11   A.    Yes.

12   Q.    Now, when you began supervising Mr. Sandler, did you meet

13   with him?

14   A.    Yes.  I met with him upon his entrance into

15   Dismas Charities, maybe a day after his release.

16   Q.    When you met with him, did you go over his conditions of

17   supervision?

18   A.    Mr. Sandler and I had an initial conversation and then we

19   had a -- an additional follow-up conversation maybe a couple of

20   days later.  It is my practice that I go over all of the rules

21   with each individual with regards to mandatory, standard, and

22   special conditions.

23   Q.    So in this case, would that have happened at that initial

24   meeting or at the follow-up meeting?

25   A.    No.  I -- I visit Dismas Charities.  Once I sit on the

```
1   community relations board.  And so as a good practice with the
2   Bureau of Prisons and Dismas Charities, we have a few officers
3   that go on a monthly basis, make sure that we make contact with
4   the counselors and with offenders and making sure that we're
5   keeping the lines of communication open.  While I was there,
6   Mr. Sandler came in.  We reintroduced ourselves.  I met
7   Mr. Sandler during 2017, 2018 because I was the investigator
8   that wrote his presentence investigation report.  So during
9   that initial contact, we were catching up.  He was telling me
10  about, you know, the different lifestyle changes he had met.
11  We made a schedule to meet with each other in a few days.  I
12  believe this was on a Thursday when we first met, and so I'm
13  pretty sure by that Monday and Tuesday of the next week we had
14  an appointment with each other.
15  Q.   I want to talk to you specifically about Violation
16  Number 1 from your petition.  Was a condition of Mr. Sandler's
17  supervision that he must pay his restitution according to the
18  schedule of payments ordered by the Court?
19  A.   That is correct.
20  Q.   Now, was that condition one of the ones that you went over
21  with him when you met with him?
22  A.   Yes, it is.
23  Q.   Do you believe that Mr. Sandler understood that condition
24  of supervision?
25  A.   Without a shadow of a doubt, Mr. Sandler knew his
```

1  obligations towards restitution.  He made a statement at

2  sentencing, he made a statement in our initial meeting, and he

3  made an additional statement at our follow-up meeting.  He --

4  his promise and his goal was to rectify all of the victims that

5  he had swindled money out of.

6  Q.   Now, ma'am, I've provided you what's been introduced as

7  Government's Exhibit 1.  Do you see that document?

8  A.   I do.

9  Q.   What is that?

10 A.   This is a judgment in a criminal case.

11 Q.   And I want to direct you to page 9 of Government's

12 Exhibit 1.  Does this page include the restitution figure that

13 Mr. Sandler was ordered to pay?

14 A.   Yes.

15 Q.   What was Mr. Sandler ordered to pay?

16 A.   It is $1,903,200.

17 Q.   And about halfway down that page, does this document

18 include the schedule at which Mr. Sandler is to make that

19 restitution?

20 A.   Yes.

21 Q.   And so am I correct that at the start of supervision, he

22 was ordered to pay at a rate of not less than $200 for the

23 first three months?

24 A.   That is correct.

25 Q.   But he was given 30 days after release of imprisonment

1  before which he had to begin making payments; is that right?

2  A.   That is correct.

3  Q.   And then after that $200 payments for the first three

4  months, was he ordered to pay $500 a month thereafter?

5  A.   Yes.

6  Q.   Are you able to sort of track restitution payments that

7  are being made by individuals that you are supervising?

8  A.   Yes.

9  Q.   How do you do that?

10  A.   There's a system called OPERA.  It is through the clerk's

11  office.  And usually when a defendant offender makes a payment,

12  it shows up as a paid monetary obligation in the system usually

13  between two to three business days after it is paid.

14  Q.   And in this case, did you monitor that system to see the

15  payments that Mr. Sandler was making?

16  A.   Yes.

17  Q.   I want to direct your attention to what's been introduced

18  as Government's Exhibit 2.  Do you -- do you see that up there?

19  A.   Yes.

20  Q.   What is this?

21  A.   This is a printout of Mr. Sandler's payments towards

22  restitution.

23  Q.   Okay.  Now, you mentioned that you began supervising

24  Mr. Sandler on February 16 of 2022; correct?

25  A.   That is correct.

1  Q.   And we also discussed how he was given sort of a 30-day

2  grace period before he had to start making payments?

3  A.   That is correct.

4  Q.   So let's -- on this document -- or according to this

5  document, did Mr. Sandler make a restitution payment in March

6  of 2022?

7  A.   He did not.

8  Q.   Is March when his first payment would have been due?

9  A.   Yes.

10  Q.   And I guess at that point, it would have been $200 that he

11  was to pay?

12  A.   That is correct.

13  Q.   Did Mr. Sandler make a restitution payment in April

14  of 2022?

15  A.   He did.

16  Q.   How many did he make in April?

17  A.   Initially, I had a discussion with him in late March,

18  early beginning of April.  Mr. Sandler had discussed that he

19  wanted to have a visit with his fiancée, his boyfriend

20  Mr. Ayers.  I advised him that in order for him -- for me to

21  approve travel, that he would need to become current on his

22  restitution.  And so in light of him wanting to have travels to

23  Florida, he went and made a payment.

24       MR. BROOKE:  Objection, Your Honor, to the extent that

25  she's characterizing his incentives or reasons for doing

1  something.

2       THE COURT:  Is this information you got from the

3  defendant?

4       THE WITNESS:  Yes.

5       THE COURT:  Okay.  Overruled.  Go ahead.

6       THE WITNESS:  I instructed him that I would not

7  approve travel if he wasn't current on his restitution.  As a

8  part of our practice in our office to deal with noncompliance

9  behavior to make sure that they are current with any monetary

10  obligations, that they have no outstanding legal issues, and if

11  those things cannot be rectified, we would not approve travel.

12  I told Mr. Sandler that since he was behind on his restitution

13  that he needed to catch it up.  He initially sent an email,

14  said I'm going to make a payment, and I'm going to follow back

15  up with another payment to get himself current.  That is the

16  reason why you have a payment on April 11 and then a follow-up

17  payment on April 21.

18  Q.  (Mr. Andreu, continuing:)  Okay.  So on April 11 of 2022,

19  he makes a $200 payment?

20  A.   That is correct.

21  Q.   And is it fair to say that basically covers him for the

22  payment that was owed in March?

23  A.   That is correct.

24  Q.   And then on April 21 of 2022, he makes another $200

25  payment?

1  A.    That is correct.

2  Q.    So at that point then, am I correct, that he's now up to

3  date for his payments for both March and April?

4  A.    Yes.

5  Q.    Okay.  Does Mr. Sandler make a payment in May of 2022?

6  A.    He does.

7  Q.    How much was that for?

8  A.    That was for $200.

9  Q.    Now, beginning in June of 2022, how much was Mr. Sandler

10  supposed to pay towards restitution?

11  A.    His payments would be increased to $500 a month.

12  Q.    Did Mr. Sandler make a restitution payment in June 2022?

13  A.    He did not.

14  Q.    Did Mr. Sandler make a restitution payment in July 2022?

15  A.    He did not.

16  Q.    Did he make one in August 2022?

17  A.    He did.

18  Q.    And was that for $500?

19  A.    Yes.

20  Q.    So the allegation that he was $1,000 in arrears, is that

21  from missing the $500 payment in both June and July of 2022?

22  A.    Yes, that is correct.

23  Q.    I want to talk to you for a moment about Mr. Sandler's

24  ability to pay restitution.  I provided you with Government's

25  Exhibit 3.  Do you see that document?

1   A.    Yes.

2   Q.    What is that?

3   A.    This is a pro se motion written by Mr. Sandler for

4   emergency motion for injunctive relief.

5   Q.    We're going to talk about this a little bit more later,

6   but is this a document that Mr. Sandler himself filed with the

7   Court?

8   A.    Yes.

9   Q.    On page 1 of that document -- I'm going to refer to the

10  last sentence of that page, it says, "on June 1, 2022, my

11  United States Probation Officer Jelesa Johnson gave me

12  permission to work on this full-time as long as I made sure I'm

13  a legal entity.  I am Razor Wire Media, LLC."

14       Are you familiar with what Mr. Sandler is talking about

15  there?

16  A.    Yes.

17  Q.    What is he talking about?

18  A.    Razor Wire is a company that he started and -- for the

19  purpose of his duration and supervised release.  That company

20  was a paralegal, consulting, criminal justice reform, motion

21  preparation company.

22  Q.    And according to Mr. Sandler on June 1, you gave him

23  permission at that stage to work as part of this company; is

24  that correct?

25  A.    Mr. Sandler had been writing motions far before June 1.

1  Even prior to him starting on supervised release, he wrote

2  approximately -- he filed approximately 11 pro se motions

3  including addendums that's filed within this Court.  That's

4  Doc. 47, Doc. 55, Doc. 56, Doc. 57, Doc. 61, Doc. 63,

5  Doc. 64, Doc. 69, Doc. 71, Doc. 78, and Doc. 81.  All of

6  those motions were filed pro se by the defendant himself.  He

7  also had made statements that while incarcerated, he filed

8  motions on behalf of --

9          MR. BROOKE:  Your Honor, I would object that this

10  answer is nonresponsive to the question that was asked.

11          THE COURT:  Okay.  Mr. Andreu, just lead her on with

12  the questions.

13  Q.  (Mr. Andreu, continuing:)  Is it -- is it correct that at

14  some point in early June, you and Mr. Sandler had a

15  conversation; wherein, you -- you allowed him to work -- to do

16  paralegal services pursuant to this company?

17  A.   That is correct.

18  Q.   Now, this document also on page 1 -- and I'm reading from

19  the last sentence of the second to last paragraph, says, "I

20  would secure a modest payment between 300 and $500 for said

21  services.  I was doing this part-time while working at

22  Huey Magoo's restaurant."

23      Are you aware that Mr. Sandler was claiming to be making

24  between 300 and $500 for his paralegal services?

25  A.   Yes.

1   Q.   And lastly on this document, I want refer you to page 2,

2   and the first sentence of the second paragraph which starts,

3   "naturally with 74 customers, I have had four complaints."

4        So is it your understanding that Mr. Sandler was claiming

5   that he was making between 300 and $500 for services and had

6   approximately 74 customers?

7   A.   Yes.

8   Q.   And to be clear, Mr. Sandler was released from custody and

9   you began supervising him on February 16 of 2022?

10  A.   Yes.

11  Q.   And this document was filed on August 10, 2022?

12  A.   That is correct.

13          MR. ANDREU:  Thank you.  I have no further questions.

14          THE COURT:  Mr. Brooke?

15          MR. BROOKE:  Thank you, Judge.

16

17                      CROSS-EXAMINATION

18  BY MR. BROOKE:

19  Q.   Officer Johnson, if we can start with Defendant's

20  Exhibit 2.  Do you still have that in front of you?

21  A.   I do.

22  Q.   This shows a total amount that he paid; correct?

23  A.   Yes.

24  Q.   Okay.  And so you recited the amounts that he paid in the

25  months after February in your direct testimony; right?

1  A.    Correct.

2  Q.    In total, though, he's paid $3,152 and -- is it .03 at the

3  bottom?

4  A.    Correct.

5  Q.    Thank you.  Now, he was arrested on the incident petition

6  on September 6 of this year; is that right?

7  A.    Yes.

8  Q.    And that was a Tuesday?

9  A.    I don't remember the day of the...

10 Q.    That's all right.  Do you recall that before that date,

11 that he had told you that he was going to be coming to the

12 courthouse and bringing $500 with him to pay to the clerk's

13 office?

14 A.    That is correct.

15 Q.    And did he, in fact, bring $500 with him?

16 A.    He did.

17      MR. BROOKE:  I have no other questions of

18 Officer Johnson on this violation, Your Honor.

19      THE COURT:  All right.  Any follow up from the

20 Government?

21      MR. ANDREU:  No, Your Honor.

22      THE COURT:  All right.  Ma'am, you can stand down.

23      Anything further from the Government in the way of

24 evidence?

25      MR. ANDREU:  Pardon me, Your Honor?

```
 1                THE COURT:  In the way of evidence.
 2                MR. ANDREU:  Oh, nothing further, no.
 3                THE COURT:  Anything from the defendant on evidence?
 4                MR. BROOKE:  Your Honor, we would submit one document,
 5      which the Government has said they have no opposition to.
 6      It's -- I've marked it as Defendant's Exhibit 1.  It's the
 7      Financial Affidavit that Mr. Sandler completed on September 6
 8      when he first had his initial appearance on this petition.  If
 9      I may approach the Court?
10                THE COURT:  You may.
11                MR. BROOKE:  I'm sorry?
12                THE COURT:  Yes.
13                Any objection from the Government?
14                MR. ANDREU:  No, Your Honor.
15                THE COURT:  All right.  It's admitted.
16                Okay.  Anything further from the defendant?
17                MR. BROOKE:  No.  Just argument.
18                THE COURT:  Okay.  We'll take argument on that, and
19      the Government has the burden, so the Government can go first.
20                MR. ANDREU:  Your Honor, the allegation in the
21      petition is -- obviously relates to restitution and Mr. Sandler
22      not making payments pursuant to his schedule of payments.  The
23      Government introduced evidence to show that restitution was
24      ordered in this case in the amount of $1,093,000 and that
25      Mr. Sandler was ordered to make those payments pursuant to a
```

1    schedule of $200 a month for the first three months -- let me

2    back up.  He got 30 days -- sort of a 30-day grace period after

3    being released, he was ordered to pay $200 a month for the

4    first three months, and $500 a month after that.

5         The testimony from Officer Johnson and the evidence

6    was that Mr. Sandler made payments, that he was released in

7    February of 2022, that he did not make a payment in March 2022;

8    which would have been okay, that in April he made two payments

9    both for $200 that would have gotten him up to date at that

10   point because $200 for April 200 for March.  The testimony and

11   evidence was that Mr. Sandler made a $200 payment in May

12   pursuant to the schedule and that Mr. Sandler made no payments

13   in either June or July of 2022.  For both of those months

14   pursuant to the Court's order, he should have paid $500.

15   Mr. Sandler --

16        THE COURT:  $500 each?

17        MR. ANDREU:  Each month.

18        THE COURT:  Yes.

19        MR. ANDREU:  Yes, sir.

20        Mr. Sandler had the ability to -- although he did not

21   pay that, he had the ability to pay it.  He submitted a

22   document to the Court indicating that he had a paralegal

23   service going; wherein, he was making between 300 and $500 for

24   each service.  He also indicated in that document that he had

25   approximately 74 clients.  That document was filed in August

1    of -- can I have one moment?

2            That document was filed on August 10 of 2022.  Just

3    splitting the difference there of the 300 and $500 would be

4    $400 times 74 customers is $29,600.  He was released in

5    February.  He files this document in August, which by his

6    admission is making approximately $29,600 and does not make his

7    $500 payment in June or July of 2022.

8            Based on that, it's the Government's position that

9    Mr. Sandler is indeed a $1,000 in arrears, that he had the

10   ability to pay restitution as ordered in both June and July,

11   but failed to do so.  And the Court should find him guilty as

12   it relates to Violation Number 1.

13           THE COURT:  Mr. Brooke, argument?

14           MR. BROOKE:  Yes, Your Honor.

15           Your Honor, of course, the question here is not

16   whether he made the payments, but whether he willfully failed

17   to make the payments.  We concede that he was behind.  I think

18   that the document speaks for itself as to when he made the

19   payments, but the question that the Government would have to

20   prove was that it was willful nonpayment, and that I submit

21   that they cannot show.

22           First of all, I would direct, Your Honor's, attention

23   to the affidavit that was submitted when Mr. Sandler was taken

24   into custody and counsel was appointed --  for, Your Honor,

25   this is Defendant's Exhibit 1.  This is showing that after he

1   had -- at the time that he was incarcerated, he was earning

2   about $2,000 a month.  His payments -- his expenses are about

3   the same.  This document would suggest, you know, he did not

4   have the money to be making those payments.  Now, obviously,

5   this is dated in September so this is not necessarily

6   reflective of what happened before.

7        So let's talk about what the Government is pointing to

8   when they say that they are estimating an average of 29,000.

9   That is not what his profit was.  That is what he was charging.

10  He says he was -- the exact wording he used -- and this is from

11  the Government's Exhibit 3 is that "I would secure a modest

12  payment between 300 to $500 for said services."  So this is a

13  payment -- this is effectively the income coming into the

14  business, but we have no idea what expenses he had with the

15  business.  The Government has not shown what expenses he has

16  with the business to show that, in fact, he could have simply

17  turned that money around and made payments as their suggesting

18  he could have done.

19        They are wanting this to be pure profit as though he

20  was saying my income from each one of these was 300 to $500.

21  That's not what he said.  What he said was that was the payment

22  that I collected.

23        But even putting that aside, let's take the 29,000.

24  Worst case scenario, all that was pure profit for him.

25  $29,000.  So we're talking about the months of February, March,

April, May, June, July.  This document was signed on August 10 so let's not count August.  We've got six months.  So that equals out to about $5,000 worth of income.  $5,000 worth of income for an -- so that's 29,000 --

THE COURT:  5,000 per month?

MR. BROOKE:  Per month, yeah.  You know, I'm rounding the 29,000 up.  Worst case scenario for me here, rounding the 29,000 to 30,000 dividing by 6, that's $5,000 of income a month.  The Government would have to show that his income -- and they would have to look at his expenses as well -- was too much -- that he had enough money leftover to be paying with that money.

The first problem is, I don't think that they've shown that he actually had that much income.  The second problem is, these payments were simply too high for him.  He was doing the best that he could.  When he came in on September 6 not knowing that he was going to be arrested -- because, of course, he wasn't told he was going to be arrested -- he brought another $500 with him.  He didn't make it to the clerk's office because he went to check in with Officer Johnson and was arrested.  But at that point, he would have been only $500 behind.  So what we're really talking about here is an individual who, at the time of his arrest, his intents and purposes at most had him $500 off.

And I submit that over the span of six months where we

don't know any of the expenses that he was incurring.  We know
that at the time that he was arrested, he's reporting an income
of 2,000 and expenses equal to about the same.  The Government
has not shown that he was engaging in willful misconduct by not
making those payments when effectively we're talking about
$500.

THE COURT:  Ms. Johnson, does a finding of guilt on
this first violation change the calculations at all on the
recommended time in prison?

PROBATION OFFICER:  No, Your Honor.

THE COURT:  Okay.  So the calculations would remain
the same?

PROBATION OFFICER:  Yes.

THE COURT:  All right.  Well, by a preponderance of
the evidence, I find that this defendant is guilty of being in
arrears on restitution.  The Government has demonstrated, and
the defendant has not denied that he brought in during this
period of time $29,600.  There's no explanation for his
expenses or any reason he couldn't pay the restitution.  So on
the evidence before me, I find that he is guilty of Violation
Number 1 on being in arrears on restitution.

Having said that, I don't think that has any -- that
has no bearing on his calculations nor does it have any bearing
on any sentence that I might give him.  So we have a finding of
guilt on violations number -- Violation Number 1.  And based on

1   the testimony before me, I adjudged Mr. Sandler guilty of

2   Violation Number 1.

3          The Court finds that the grade of violations is

4   Grade B as stated in 7B1.1 of the guidelines and that the

5   criminal history category was determined at the time of

6   sentencing to be Category 1.  The arrangement of imprisonment

7   applicable for revocation of under the advisory guidelines is 3

8   to 9 months.  The maximum term of imprisonment pursuant to

9   3583(e)3 is not more than two years.

10          MR. BROOKE:  Your Honor, we would observe that -- I

11   believe it is a Grade C.  The 3 to 9 months, we agree with, but

12   I believe that the Grade violation is a C not a B.

13          THE COURT:  What says probation?

14          PROBATION OFFICER:  He is correct, Your Honor.  That's

15   a typo.

16          THE COURT:  Oh, okay.  All right.  The grade of

17   violation then -- I stand corrected -- is a Grade C violation.

18          Does the Government dispute the calculations?

19          MR. ANDREU:  No, Your Honor.

20          THE COURT:  All right.

21          The Court's finding of guilty as to Violations 1, 2,

22   and 3 of the petition -- 2 and 3 having been pleas of guilt --

23   guilty -- is ordered that the term of supervised release

24   imposed on March 26, 2019 is revoked.

25          Now, Mr. Sandler, do either you or your attorney have

1  anything to say in mitigation or otherwise before the Court

2  pronounces sentence?  To be clear, this is your opportunity to

3  address the Court if you wish, but you're not required to do

4  so.

5            So let's let Mr. Brooke lead us here.

6            MR. BROOKE:  Your Honor, we will prepare argument.

7  It's -- I'm not sure if the Government intends to introduce

8  arguments as to sentencing.  If they do, then I would ask that

9  they go first.  But I will certainly make an argument if they

10  do not.

11            THE COURT:  Well, the Government has already said they

12  have more evidence.

13            So does the Government have the evidence you want to

14  put on now on these other two violations?

15            MR. ANDREU:  Yes, sir.

16            THE COURT:  Okay.  Let's go ahead and do that, and

17  then Mr. Brooke will have everything before him.

18            MR. BROOKE:  Did I mis- -- I may have misunderstood

19  what, Your Honor, was asking.  Was, Your Honor, asking if we

20  had anything to say before pronouncement of sentence?

21            THE COURT:  Yes.

22            MR. BROOKE:  Okay.  Then -- then, yes.  I think this

23  is how to proceed.

24            THE COURT:  Yes.  Go ahead.  Call your witness.

25            MR. ANDREU:  Yes, sir.  The United States calls

```
1   Probation Officer Jelesa Johnson.

2           THE COURT:  All right.  Ms. Johnson, you're still

3   under oath.  Come on up.

4           You may proceed.

5           MR. ANDREU:  Thank you, Your Honor.  At this time, the

6   Government would seek to introduce what has been premarked as

7   Government's Exhibits 4 through 12.  A copy has been provided

8   to the defense, and we seek to introduce those as Government's

9   Exhibits 4 through 12.

10          THE COURT:  Is there objection from the defense as to

11  the introduction of those exhibits?

12          MR. BROOKE:  No, Your Honor.

13          THE COURT:  All right.  Those are admitted without

14  objection.  So we have Defendant's Exhibits 1 through 12

15  admitted.

16          MR. ANDREU:  Government's exhibits, Your Honor.

17          THE COURT:  I'm sorry.  Government's Exhibits 1

18  through 12 admitted.

19          MR. ANDREU:  And may I approach?

20          THE COURT:  You may.

21          MR. BROOKE:  Your Honor, I have the original of

22  Defendant's 1.  There may be other exhibits.  If, Your Honor,

23  would like the original Defendant's 1 now, I'll give it to you.

24  Otherwise, I'll just keep the originals and then give them to

25  you at --
```

```
 1         THE COURT:  Just keep them until we need them.  And
 2   Defendant's 1 is part of the record in the case anyway.
 3         MR. BROOKE:  Thank you, Judge.
 4         THE COURT:  Go ahead.
 5
 6                    **JELESA JOHNSON,**
 7              The witness, having been duly sworn to speak the
 8   truth, the whole truth and nothing but the truth, testified as
 9   follows:
10
11                    DIRECT EXAMINATION
12   BY MR. ANDREU:
13   Q.   Officer Johnson, I understand that Mr. Sandler has
14   admitted to Violations 2 and 3, but I just want to talk through
15   those a little bit and understand how, in fact, he violated
16   those conditions.  As to condition 2, was a condition of
17   Mr. Sandler's supervision that if he knows someone is a
18   convicted felony, that he must not communicate with that person
19   unless his probation officer approves?
20   A.   That is correct.
21   Q.   Are you familiar with a person named Cody Ayers?
22   A.   Yes.
23   Q.   Who is Mr. Ayers?
24   A.   Mr. Ayers is the fiancée of Kyle Sandler.
25   Q.   Is Mr. Ayers a convicted felon?
```

1    A.    He is.

2    Q.    On approximately May 11 of 2022, did you have a meeting

3    with Mr. Sandler concerning Mr. Ayers?

4    A.    I did.

5    Q.    Can you talk to us about what led up to that meeting?

6    A.    The meeting that occurred in May was a combination of

7    certain actions by Mr. Sandler over the course of March and

8    April.  It kind of began with Mr. Sandler's incessant emails,

9    and it just progressed into something that was kind of

10   overwhelming.  In April, I had told Mr. Sandler that he was

11   sending emails, making phone calls, and sending text messages

12   pretty much on a daily basis.  I had had consistent

13   communication from him from February 16 up until May.  And when

14   I say "consistent," I mean daily text messages, emails, they

15   were repetitive.  If I didn't answer in a time frame that he

16   didn't like, he would just consistently follow up.

17        And so pretty much what would happen is I reached out to

18   his mother.  His mother said that she would talk to him.  And

19   she talked about his -- his mindset and how if he didn't like

20   an answer that was given to him, he kind of just pressed and

21   pressed and pressed.  Sometime in April, I gave a directive to

22   Mr. Sandler that we would only communicate by him making an

23   appointment with me once a month and that all emails and

24   correspondences that he needed to refer to me, he needed to

25   build those up.  I wouldn't respond to them, and we would talk

1  about them at our monthly meeting.

2      To be frank and clear, there was nothing that was pressing

3  day to day that needed to be addressed.  He would just have

4  commentary questions that he would just always follow up with

5  and so --

6  Q.  If I can -- if I can interrupt for a second.

7  A.  Go ahead.

8  Q.  So in these emails and text messages in March and April,

9  did any of those concern Cody Ayers?

10  A.  Yes, yes.

11  Q.  Can you tell us about that?

12  A.  So pretty much initially when I met with Mr. Sandler in

13  February, he stated that his sole intention to was to get to

14  Florida.  He had no desire to live in the Middle District of

15  Alabama, specifically Montgomery.  He had no ties to this city.

16  He had no relationships with anybody in this city.  And

17  frankly, his business that he conducted was in Lee County.  He

18  did have some associates -- some friends, but he had a

19  relationship with Mr. Ayers, who was at the time under the

20  Bureau of Prisons with the home confinement program and his

21  sole intention was to get to Florida.

22      And so around the time of early April, he filed a motion

23  with the Court asking for emergency relief from

24  Dismas Charities.  And once I made a status report to the Court

25  asking that they release Mr. Sandler -- and this was based off

1    the plan that he had given to me -- and that plan was for him

2    to reside in an apartment complex.  It was owned by a city

3    councilman in Montgomery and that he would take residence in

4    the beginning of May and that in the time frame from him being

5    released to Dismas until May, he would stay at a weekly hotel

6    and pay those fees until the apartment became available.

7        And initially immediately after he was released, he

8    presented to me another updative plan.  So his initial plan was

9    just be released from Dismas, go to the residence in Montgomery

10   in early May when it became available, but as soon as

11   Judge Watkins signed the order; he followed up with an email

12   asking for an change in plans.  And those changing plans were

13   for me to send in a request -- a relocation request to Florida.

14   Q.   So at this point, he's been -- this is May, and he's been

15   released from his Dismas --

16   A.   This is April.  This is April, and he's been released, and

17   the day that he's released, he sends an email and says, I have

18   a change in plan.  I want to transfer my supervision down to

19   Florida.

20   Q.   And is it your understanding at that point that at least

21   part of the reason he wants to do that is so he can be with

22   Cody Ayers?

23   A.   That is correct.  I informed him that I had no issue with

24   transferring his supervision to Florida.  But he needed to

25   know, and I explained in detail, that there is -- there is a

1    chain of events.  There is a policy and procedure for how

2    transfers are to take place.  What occurred was, he accepted a

3    job in Jacksonville, Florida at the Huey Magoo's as a -- as a

4    manager, and he needed to get down there very quickly, within

5    like two weeks.  And naturally when you put in for a transfer

6    of supervision, it takes approximately at the very minimum at

7    least 30 days for that supervision, that relocation request to

8    be investigated.

9        And so initially I responded and said that I would send

10   the relocation request, that I would write it up really nice,

11   give him the best opportunity because I knew that he had no

12   real ties to anything in Florida besides a relationship with

13   Mr. Ayers.  And Mr. Ayers at that time was still under a Bureau

14   of Prisons sentence.  So he was asking for a relocation request

15   to work at the same restaurant in Jacksonville, Florida that he

16   worked at in Montgomery.  So upon me submitting that relocation

17   request, I sent Mr. Sandler an email telling him pretty much

18   laying out what all were the necessary steps and policies and

19   procedures that he would have to abide by in this time.  One of

20   those things that Florida stated on their website was that the

21   individual cannot reside in Florida during this time period.

22       Mr. Sandler repeatedly kept emailing asking for seven-day

23   passes down to Florida, and I would respond accordingly that

24   you cannot be in Florida during this relocation investigation.

25   But that was not an answer that he could take because he had

1    accepted a job prior to and told them that he would be in

2    Jacksonville, Florida.  So he was trying to expedite a

3    relocation request that he had no permission to do so.  And so

4    those are where the excessive emails come to pass.

5    Q.   As part of any of those emails, is he mentioning this

6    Cody Ayers person?

7    A.   Yes.

8    Q.   And is he indicating within any of those emails that he

9    wants to be with Cody Ayers?

10   A.   Yes.  The problem -- part of the -- well, it wasn't a

11   problem.  He was trying to get to Jacksonville.  Cody lived in

12   a different city -- or that's where his supervision would --

13   would be.  Those two cities I want to say -- and I don't want

14   to tell a lie -- but it was a good two hours -- at minimum a

15   two-hour distance between the two cities that Mr. Sandler was

16   going to reside in and that Mr. Ayers would be living in as a

17   part of his supervision.

18        And so he would send incessant emails asking for me to

19   check up, asking me to call Florida.  I explained to him that I

20   wasn't going to interrupt the process that Florida had in

21   place.  I know how overwhelming it is as a supervising officer

22   to not only deal with the case load that you have as well as

23   deal with prereleases, transfers, relocations.  It was just not

24   something that needed to be expedited at that moment.

25        When I told Mr. Sandler that, he didn't like those --

those words to me.  So he went over my head, made contact down
with the officer who was going to be investigating his
relocation request, and pretty much got the same answer that I
had been telling him; that it was going to be a long shot.  He
had no specific ties to Jacksonville.  He had -- although, he
had associates, he had friends.  All of those friends were
convicted felons -- well, majority.  I won't say all of them.
A good portion of those individuals had felonious backgrounds.

    And so as a part of investigation, you're not only
investigating the residence that he's intending to live in,
which was going to be a weekly hotel, you're also investigating
the people that he's trying to have contact with, potentially
reside with, and he just had nothing concrete for Florida to
accept his relocation request.

Q.   Okay.  So with that backdrop, let's jump to this meeting
that occurs on May 11 of 2022.  What occurred at that meeting
between you and Mr. Sandler?

A.   So during that meeting, I pretty much told him that the
way that he had been conducting business would no longer
transpire.  He had previously told me that in his way of doing
business "no means go."  So when he got an answer of "no," that
didn't stop him.  He would press, press forward to keep going
forward to get the answer that he wanted.  So pretty much in
that meeting of May -- on May 11, I issued him a written
reprimand.  In that written reprimand was for him failing to

1  follow the instructions by me, and those instructions were with

2  regards to the incessant emails that were used in retaliation

3  to manipulate his transfer to Florida, as well as to manipulate

4  his interaction with Mr. Cody Ayers.

5      So as a part of that written reprimand, I had told him

6  that based on the blatant violation of the said standard

7  conditions of supervision, I'm issuing you a written reprimand.

8  Q.   Can I stop you for one second?

9  A.   Go ahead.

10 Q.   This written reprimand that you issued to Mr. Sandler --

11 if I could direct your attention to Government Exhibit 5.  Is

12 that a copy of the written reprimand that you're talking about?

13 A.   Yes.

14 Q.   And among other things, this says, "please be advised that

15 you have failed to comply with the following conditions of

16 supervision by" -- it lists two, and the second one is

17 "standard condition, you must follow the instructions of the

18 probation officer related to the conditions of supervision?"

19 A.   That is correct.

20 Q.   Now, is this document signed by Mr. Sandler?

21 A.   It is.

22 Q.   Okay.  And did he accept this document from you?

23 A.   Not initially.  He signed the document, and when I told

24 him that I would make a copy for his records, he stormed off

25 and left the -- the office.  So I emailed him a copy later on.

1  Q.   And then you started to talk about what you actually

2  advised Mr. Sandler as part of that meeting.  Let me ask you,

3  did you write down what you were going to say to Mr. Sandler as

4  part of that meeting?

5  A.   I did.  Mr. Sandler had presented himself as a person that

6  I had to be very careful with the choice of words that I used

7  with him.  He would hear one thing and interpret it another

8  way.  So upon our meetings in April when I gave him the orders

9  to stop on the emails, when he gave me his train of thought

10 with "no means go," it was very -- became very apparent to me

11 that I needed to be very particular with the words that I spoke

12 to him.

13      So upon that meeting, I wrote down a statement that I was

14 going to issue to him.  I prepared the written reprimand and

15 had him sign it.  And upon issuing the written reprimand and

16 signing it, I made the following statement.

17 Q.   And is that -- Government's Exhibit 4 is an email that you

18 provided to myself and Mr. Brooke; is that correct?

19 A.   That is correct.

20 Q.   And does this email include the word-for-word statement

21 that you read to Mr. Sandler?

22 A.   That is correct.

23 Q.   And could you please read for us the relevant portion of

24 that statement?

25 A.   I said, "based on the blatant violation of said standard

1   conditions of supervision, I am issuing you a written

2   reprimand.  As a result of this written reprimand, I am

3   restricting all discretionary travel for 90 days.  This means

4   that there will be no travel permitted during this period.

5   Additionally, since you're noncompliance involves incessant

6   demands to maintain contact with a current inmate with the

7   Bureau of Prisons, I will prohibit any and all contact with

8   Cody Ayers until further notice of the probation officer.  This

9   issuance of this directive will coincide with Rule 8 of the

10  standard conditions of supervision that you must not

11  communicate or interact with someone who has been convicted of

12  a felony."

13  Q.   You mentioned a moment ago that Mr. Sandler did not sign

14  the written reprimand and left the office.  How did he receive

15  this written -- this oral statement that you gave to him?

16  A.   So he did sign the written reprimand.  I offered to make

17  him a copy for his records.  And upon me offering -- giving --

18  asking him for a second so I can go make a copy, he didn't want

19  it, and he stormed off.  He was ready to leave at that moment.

20  So I scanned a copy and emailed it to him.

21  Q.   Okay.  So this is on May 11 of 2022.  You've given

22  Mr. Sandler the written reprimand, you've read to him word for

23  word this oral statement that you just read for us.  Did

24  Mr. Sandler follow your directive to have no contact with

25  Mr. Ayers?

1    A.    Initially, I had no knowledge of any contact that he would

2    have.  To -- to provide some clarification, I stated to

3    Mr. Sandler during that meeting that there was no real way that

4    I would be able to discern if he was maintaining contact with

5    Cody Ayers.  I wasn't going to necessarily go through his

6    phone, check his phone records, subpoena any documents to -- to

7    make sure that this communication would be severed.  But I

8    stated to Mr. Sandler that most people they will mess up the

9    action of you disobeying the directive of your probation

10   officer will come to light.

11       So at -- initially, I did not know for certain that he was

12   having contact.  I had spoken to him later in June and that was

13   around the time that he made an admission about some medical

14   history that had been going on, and I did give him permission

15   to speak to Mr. Ayers during that time.  I thought it was

16   apparent that a conversation needed to occur between Mr. Ayers

17   and Mr. Sandler based on the information that I had received

18   with regards to Mr. Sandler.  And during that time period, I

19   remember speaking to him and asking him in a frank moment had

20   he been communicating, and he said just a little bit but not

21   much, and this was not in regards to me giving him the

22   permission but this was outside.  And that really wasn't a

23   cause for concern either.  But what occurred and what came to

24   light was that the communication never really stopped.  It was

25   a continuous communication from the issuance of the directive.

1  That pretty much came to light by various individuals that he
2  conducted business with.
3  Q.   Now, you mentioned that you gave him permission to have
4  some contact with Mr. Ayers during that time frame.  What time
5  frame did he have permission to contact with Mr. Ayers?
6  A.   That time frame was around June 14.  I had made a home
7  contact with Mr. Sandler and that was based off collateral
8  contact that I had with Dr. Kirkland.  And Dr. Kirkland reached
9  out to me and gave me a heads-up on some information that
10  Mr. Sandler disclosed with him and told me that, you know, you
11  may want to have a conversation with him, and so I made a
12  contact visit with him at his residence.  We talked about it,
13  and based off of the information that was disclosed to me by
14  Mr. Kirkland -- Dr. Kirkland and Mr. Sandler, I thought it was
15  in good practice to give him a few days to have communication
16  with Mr. Sandler in light of the information that had been
17  disclosed to me.
18  Q.   Okay.  So now let's fast-forward to August of 2022.  Do
19  you recall receiving an email from Mr. Sandler where he was
20  asking you or begging you for permission to go to Florida and
21  among other things have contact in Florida with Mr. Ayers?
22  A.   Yes.  So right after the directive in May for their -- for
23  all discretionary travel to be eliminated, he pretty much made
24  contact with me maybe a few weeks later discussing a trip that
25  he had already preplanned in Orlando for Mr. Sandler and

1   another individual to take Mr. Ayers to Disney World.
2   According to him, Mr. Ayers had never been and that was a trip
3   that he really wanted to take Mr. Ayers to.  So I pretty much
4   knew that he had a planned trip to Orlando, but he had not been
5   granted permission.  Again, it is of good practice of our
6   office that the defendant must be in a compliant behavior,
7   compliant with restitution, compliant with all directives of
8   the supervising officer, just compliant overall with the
9   conditions of supervision; and we will not grant discretionary
10  travel based off noncompliant behavior.
11       So I was well aware of the trip that he had planned to
12  Disney World.  I had not given him prior approval, and this was
13  part of the emails that he continued to send asking for said
14  approval.  And so I -- I never gave it to him.  Other issues
15  came up in light later on.
16  Q.   After the -- after you get this email in August, do you
17  recall a meeting that you had with Mr. Sandler on August 11
18  of 2022 where you spoke to him about that request that he had?
19  A.   Yes.  So what occurred was, I was in the field on
20  August 8.  That was a Monday.  And on August 8, I received a
21  phone call from an individual that Mr. Sandler had conducted
22  business with.  And during the -- the process of this phone
23  call, information was given to me that Mr. Sandler had been
24  conducting bad business, that there were individuals that
25  Mr. Sandler had taken money from but did not produce any

1   motions for.  There were people who if they were unhappy with

2   the services that Mr. Sandler had provided, and they made any

3   kind of -- they provided any information through Facebook about

4   their displeasure.

5          MR. BROOKE:  Objection, Your Honor.  I'm going to

6   object to a lack of foundation.  I'm not -- right now I'm just

7   not clear on if all of this information is coming from this

8   anonymous person or if it's coming from somewhere else.

9          THE COURT:  Follow up with a question to clarify it.

10  Q.   (Mr. Andreu, continuing:)  I tell you what,

11  Officer Johnson, I'm going to come back to the allegation about

12  Mr. Sandler's business --

13  A.   Okay.

14  Q.   -- and some of the complaints and stuff you got.  So just

15  as it relates to Mr. Ayers at this point, did you have -- sort

16  of focus on that part anyway.

17  A.   Okay.

18  Q.   Did you speak to Mr. Sandler on August 11 of 2022?

19  A.   I did.

20  Q.   And what did you tell Mr. Sandler in regard to Mr. Ayers

21  on August 11 of 2022?

22  A.   (No response.)

23  Q.   And let me ask that different -- let me ask you something.

24  Do you as part of your duties as a probation officer, do you

25  keep a record -- or at least in this case, did you keep a

```
1   record of emails with Mr. Sandler and meetings with

2   Mr. Sandler?

3   A.    That is correct.

4   Q.    And would looking at a copy of that record refresh your

5   recollection as to your conversation with Mr. Ayers on --

6   Mr. Sandler on August 11 of 2022?

7   A.    Yes.

8            MR. ANDREU:  May I approach?

9            THE COURT:  You may.

10           MR. ANDREU:  May I approach?

11           THE COURT:  You may.

12   Q.    (Mr. Andreu, continuing:)  Ma'am, if you could take a

13   moment to review that document and then just let me know once

14   your recollection has been refreshed.

15           (Brief pause in the proceedings.)

16   A.    Okay.

17   Q.    Are you now able to recall like the specifics of your

18   conversation with Mr. Sandler on that day?

19   A.    Yes.  So Mr. Sandler reported to the office per my

20   instruction.  This was the day after --

21           MR. BROOKE:  Your Honor, I'd object.  I just want to

22   clarify.  If the witness is recalling this from her memory or

23   if she's recalling from the document?  If it's from the

24   document, I would ask that it be moved into as an exhibit.

25           THE COURT:  Ma'am, is your recollection refreshed by
```

1  the document?

2          THE WITNESS:  Yes.  I -- I have the timeline in my

3  head.  I can go through the full timeline if you want, but on

4  August 10, I gave the directive --

5          THE COURT:  Overruled.

6          THE WITNESS:  I gave the directive to Mr. Sandler

7  regarding his business no longer being able to be operative.

8  On August 11, I asked him to come to the office so he could

9  fill out a financial investigative packet.  A part of him

10 filling out that financial investigative packet was because he

11 had been conducting so much business that we needed some

12 updated materials with regard to his business dealings.

13 Mr. Sandler continued to inquire if his trip to Orlando could

14 continue.  Based on the information that I had received from

15 August 8, 9, and our interaction on August 10, and our

16 continued interaction on August 11; I told him that the

17 no-contact order with Mr. Ayers would continue in place per my

18 directive and that although his discretionary travel was lifted

19 based off of the directive issued in May 11 of 2022 that I

20 would not approve his travel to Florida for the purposes of him

21 to interact with Mr. Ayers at Disney World.

22 Q.   (Mr. Andreu, continuing:)  Now, I want to direct your

23 attention to Government's Exhibit 6.  Is this an email that

24 Mr. Sandler provided to you on Saturday, August 13 of 2022?

25 A.   It is.

1    Q.   No -- first of all, am I correct that this email is

2    actually regarding a matter not related to Mr. Ayers?

3    A.   Correct.

4    Q.   But as part of that email, was there an attachment of a

5    screenshot of a conversation between Mr. Sandler and Mr. Ayers?

6    A.   Yes.

7    Q.   Now, what is this a screenshot of?

8    A.   It is a screenshot of what I believe to be Facebook direct

9    Messenger.

10   Q.   And this screenshot is about three pages printed out; is

11   that right?

12   A.   Yes.

13   Q.   And it's basically just a bunch of messages back and forth

14   between Mr. Sandler and Mr. Ayers?

15   A.   Correct.

16   Q.   Now, this document -- now, this screenshot is not dated,

17   is it?

18   A.   It is not.

19   Q.   So you don't know when this series of messages occurred?

20   A.   That is correct.

21   Q.   But is it correct to say that you were provided it on

22   August 13, 2022, which would be after that August 11 directive

23   that you gave him?

24   A.   Correct.

25   Q.   Ma'am, I want take your attention now to Government's

1  Exhibit 7.  Do you recognize that document?

2  A.    Yes.

3  Q.    What is this?

4  A.    This is taken from Cody Ayers's Facebook page.

5  Q.    How did you retrieve this document?

6  A.    From our production -- our probation assistant in the

7  office was able to logon to Facebook and procure said

8  screenshot.

9  Q.    Now, does this appear to be a Facebook posting by

10 Cody Ayers?

11 A.    It is.

12 Q.    And some -- some comments that were made by various

13 people?

14 A.    That is correct.

15 Q.    What is the date of this Facebook posting by Cody Ayers?

16 A.    August 29.

17 Q.    And can you just -- not the picture, but can you just read

18 the posting for us?

19 A.    It says, "Kyle Sandler, thank you for always making me

20 laugh even when I don't think I can.  I really appreciate you

21 and everything you do."

22 Q.    Did Mr. Sandler reply to that posting on August 29

23 of 2022?

24 A.    He did.

25 Q.    What did he reply?

1   A.   He said, "Aw.  Thank you, Cody.  I love you to the moon."

2   Q.   Let's go to Violation Number 3.  Was it a condition of

3   Mr. Sandler's supervision that he was to follow the

4   instructions of his probation officer related to the conditions

5   of supervision?

6   A.   Yes.

7   Q.   Now, at some point while on supervision, does Mr. Sandler

8   notify you that he wants to start a business?

9   A.   Yes.

10  Q.   What was that business?

11  A.   The business was Razor Wire Media, and it was a paralegal

12  services, criminal justice reform business.

13  Q.   Approximately when does he notify you that he wants to

14  start that business?

15  A.   He made comments when we initially met because one of the

16  initial comments he made to me was there was a nunc -- a pro

17  nunc motion that he made on his behalf of in Lee County and

18  that there was a motion that he made about a compassionate

19  release.  So according to Mr. Sandler, he had been making

20  motions pretty much his entire time during custody and that he

21  had alluded that he had been filing motions on other peoples

22  behalf and that he had been procuring funds from filing those

23  motions and that he would like to make this a full-time

24  business and he asked for approval to stop working at Huey

25  Magoo's and to take the paralegal business that he had started

1  and make it legit.

2  Q.   Did you initially give him approval to do so?

3  A.   Initially, myself and my supervisor Ron Tweet we were very

4  hesitant about allowing him to -- to take on this business.

5  But based on noticing that he had filed different motions

6  within this Court as well as that he had already started the

7  business -- maybe not under full scale on a very limited

8  basis -- on behalf of people he considered close associates and

9  friends that -- and based off his assertions that he was

10  qualified to do so, we allowed for him to -- to go forth with

11  the business.

12  Q.   Now, you said that you were hesitant at that -- at that

13  time frame.  Did you set any conditions on his ability to -- to

14  start this business?

15  A.   We did.  I told him that I would need a copy of all

16  motions that he filed on -- on individuals behalf as well as

17  some kind of spreadsheet keeping those different clients of him

18  in order per month.  And so a part of the condition that I put

19  in place was the following month at the beginning of each month

20  when he reported with his monthly report that part of the

21  condition would be that he would report all filings for the

22  previous month.

23  Q.   At some point, after giving him permission on this --

24  under these conditions to do the business, did you become

25  concerned about the business?

1    A.    Yes.

2    Q.    Why?

3    A.    There were a couple statements that Mr. Sandler came out,

4    and he would address them in email form.  He would state that

5    you know, he thought that certain people would be upset and

6    that -- I guess he had heard of rumblings through Facebook of

7    if somebody was upset with his motion that they would make a

8    post on Facebook and he would be altered because he had a lot

9    of associates and friends that he did business with.  But the

10   real -- the real issue became very apparent in early August.

11   And that's when I received an email -- a phone call, excuse

12   me -- I received a phone call and that phone call just opened

13   up a litany of follow-up phone calls from various individuals.

14   Q.    Let's walk through that a little bit.  Who did you get

15   this phone call from?

16   A.    I got a phone call from an individual by the name of

17   Mike Rammel.  And Mr. Rammel was an individual who Mr. Sandler

18   had wrote a compassionate release on behalf of his wife.  Now,

19   Mr. Sandler did tell me that upon writing this compassionate

20   relief, he did not think that Mr. Rammel would get the

21   compassionate release for his wife.  I believe that his wife

22   had committed some financial crimes and had received a

23   significant sentence, but that she had some health conditions,

24   and she was just looking from some leniency from the Court with

25   regards to a compassionate release.  Mr. Rammel stated that

1    when they were in court taking up the matter, that the

2    sentencing judge laughed at the compassionate release, laughed

3    at the composition of it, how poorly written it was, and how he

4    didn't understand why this motion was in his -- in his --

5    before him at this particular time.

6         And according to Mr. Rammel, there were other people that

7    he had heard from -- and this is hearsay -- but there were

8    other individuals that he had heard from that had similar

9    experiences as well as for some individuals they never received

10   their motions and for anybody who had a similar experience to

11   Michael Rammel, if they voiced their concerns, it is alleged --

12   this is not proven -- that Mr. Sandler alleged to have had

13   people on the inside and they would get -- he would have their

14   loved ones roughed up.

15   Q.   And I want to be clear about that, were you contacted

16   directly by people who made that --

17        MR. BROOKE:  Your Honor, I'm going to object to that

18   testimony.  There's no -- I understand hearsay is permitted,

19   but there is no indicia of reliability that has been laid for

20   that statement.  That is a very incendiary statement.  I would

21   ask that -- that before a statement like that be permitted -- I

22   first ask that it be stricken.  And that before that allowed to

23   be introduced, that some -- some basis of indicating indicia of

24   reliability be provided.

25        THE COURT:  Mr. Andreu, your response?

1          MR. ANDREU:  Your Honor, I can lay some foundation for

2    how Probation Officer Johnson received that information.  I

3    think that it is hearsay, and the Court can give it the

4    appropriate weight.

5          THE COURT:  All right.  Go ahead and lay the

6    foundation for it.

7          MR. ANDREU:  May I approach the witness for a second

8    to retrieve the document I gave her?

9          THE COURT:  Sure.

10   Q.   (Mr. Andreu, continuing:)  Officer Johnson, I believe you

11   were just talking about a contact that you had from

12   Michael Rammel; is that correct?

13   A.   Yes.

14   Q.   And did that occur on approximately August 8 of 2022?

15   A.   It did.

16   Q.   Now, when he made this sort of complaint to you about

17   Mr. Sandler, you talked about how his complaint was based on

18   something that Mr. Sandler had drafted for his wife?

19   A.   Correct.

20   Q.   Now, Mr. Rammel didn't tell you that Mr. Sandler had

21   threatened him or his wife in any way; is that right?

22   A.   That is correct.

23   Q.   What did Mr. Rammel tell you that he -- well, did

24   Mr. Rammel tell you that he had heard from other customers of

25   Mr. Sandler?

1    A.    Yes.   Mr. Sandler obtained clients from different Facebook

2    groups.   These Facebook groups were prison reform groups,

3    people advocating on behalf of their loved ones trying to get

4    compassionate release, trying to motion for time for First Step

5    Act credit.   And so Mr. Rammel was aware because there were

6    multiple individuals on these Facebook groups that Mr. Sandler

7    at one time had been apart of making statements about his

8    services.

9    Q.    And did Mr. Rammel tell you that he had heard that

10   Mr. Sandler would threat other inmates?

11            MR. BROOKE:   I renew my objection.   It's still lacking

12   any basis for understanding how Mr. Rammel would have learned

13   that information that would allow the Court to make any

14   ascertainment as to the voracity of those statements.

15            THE COURT:   What's your response?

16            MR. ANDREU:   Your Honor, I don't deny that the

17   statement is hearsay.   Hearsay is allowed at this proceeding

18   obviously, and I stand by my response that because it's relayed

19   hearsay from Mr. Rammel, that the Court can assign it the

20   appropriate weight.

21            MR. BROOKE:   Your Honor, hearsay is permitted, but the

22   due process clause still requires minimal indicia of -- of

23   reliability, and those are completely lacking here.   We don't

24   know who made these statements.   We don't know who -- I mean,

25   we have nothing other than Mr. Rammel who we don't know much

1    about maybe heard them from someone else who we know nothing

2    about.

3            THE COURT:  I'm going to sustain the objections unless

4    you can give any indicia of reliability for Mr. Rammel.

5            MR. ANDREU:  Okay.  I'm going to abandon that

6    statement.

7    Q.  (Mr. Andreu, continuing:)  Ms. Johnson, were you also

8    contacted on August 10, 2022 via phone by someone who wanted to

9    remain anonymous?

10   A.   Yes.

11   Q.   And did that person call you from a phone number that was

12   different than the phone number that Mr. Rammel called you on?

13   A.   That is correct.

14   Q.   Did that individual who chose to remain anonymous talk to

15   you about Mr. Sandler?

16   A.   He did.

17   Q.   And in this situation unlike when you spoke to Mr. Rammel,

18   you're talking directly to the person; is that right?

19   A.   That is correct.

20   Q.   What did that person tell you about the services

21   Mr. Sandler had provided them?

22           MR. BROOKE:  Your Honor, I'm going to object again.

23   Unless foundation can be laid that this was somehow verified.

24   I mean we have listings of all the clients that Mr. Sandler

25   represented.  If we're not allowed to know who this individual

1    is who's lodging complaints, how can we possibly present a

2    defense?  We've talked to numerous individuals and numerous of

3    the months, we check records to see whether or not the services

4    were provided.  I'll get this out later in direct testimony to

5    show that it was done.  But to allow an anonymous caller to --

6    I mean, if testimony is going to come out that says that

7    Officer Johnson looked into it herself and independently

8    determined that a violation happened, then that's fine, and

9    I'll take it up with Officer Johnson.  But if it's just an

10    unanimous caller saying, Oh, this happened to me, that can't

11    stand.

12            THE COURT:  Ms. Johnson, did you receive more than one

13    such call?

14            THE WITNESS:  I did.

15            THE COURT:  How many?

16            THE WITNESS:  I received several.  My number was

17    posted on Facebook.

18            THE COURT:  How did that happen?

19            THE WITNESS:  From an interaction with Mr. Sandler.

20            THE COURT:  So Mr. Sandler put your number on

21    Facebook?

22            THE WITNESS:  Yes.

23            THE COURT:  And based upon that, you began to get

24    calls?

25            THE WITNESS:  That is correct.

1        THE COURT:  Overruled.

2    Q.  (Mr. Andreu, continuing:)  So focusing for a moment on

3    this call with a anonymous person, did they provide you with

4    similar allegations against Mr. Sandler?

5    A.  Yes.

6    Q.  What did they say?

7        THE COURT:  Let's don't go into what they said.

8    Let's -- what we're establishing here is the fact that

9    complaints were coming in and it caused her to take some kind

10   of an action.

11       MR. ANDREU:  Yes, sir.

12   Q.  (Mr. Andreu, continuing:)  And so Ms. Johnson --

13   Officer Johnson I'll just go right off that.  Based on these --

14   well, is it fair to say you were getting a series of complaints

15   from individuals?

16   A.  That is correct.

17   Q.  And all those complaints related to the work that had or

18   had not been provided by Mr. Sandler?

19   A.  That is correct.

20   Q.  And that does go to what I was asking you early, which was

21   whether or not at some point you became concerned about the

22   business.

23       After you were getting these -- these calls and contacts

24   from individuals, did you end up having a meeting with

25   Mr. Sandler on August 10 of 2022?

A.    I did.

Q.    What happened at that meeting?

A.    Well, I had a meeting with him on August 10.  On
August 10 -- prior to the August 10th meeting, I had a meeting
with my supervisor Ron Tweet.  We discussed their matter at
length, and we came to the conclusion that it would be in best
practice -- since there are so many various individuals making
contact with our office -- that it would be in best practice
that we tell this -- we tell Mr. Sandler that the business
needed to be eradicated, the business needed to be closed at
the end of the day, and that he could no longer service any
clients that he had on commission that he had already made a
verbal agreement with to conduct business with.

       So when myself and my supervisor came to that conclusion,
I called Mr. Sandler in.  He came as directed, and during the
course of this meeting, I pretty much explained to him that his
business would no longer be in operation.  I explained to him
that over the course of the last few days that I had received
multiple phone calls.  I had received multiple emails, multiple
voicemails, text messages, direct messages from individuals,
people who wanted to remain anonymous, people who changed their
number because they stated they were in fear regarding the
business of Mr. Sandler.  And upon the information that was
disclosed to me by those various individuals, those who spoke
their name and those who, you know, decided to remain

1    anonymous, that we decided collectively that his business would

2    be ended at the close of business that day.

3    Q.    Okay.  So you told him he had until the close of business

4    and you said that was August 10, 2022 to cease that business?

5    A.    That is correct.

6    Q.    Now, did Mr. Sandler agree with that decision?

7    A.    He did not.

8    Q.    And -- no, go ahead.

9    A.    I informed him that the business would cease by the close

10   of business.  He was -- he was hesitant for multiple reasons,

11   some that I understand completely.  He stated that there were

12   some individuals that he had not produced the motions for, and

13   I told him that you could no longer work on those motions, and

14   that you needed to terminate business with those individuals.

15   And since you can no longer continue business, you just needed

16   to return the money.  Mr. Sandler stated to me that there was

17   no money to return and that he had spent it all.

18         And so he was hesitant that people would potentially file

19   charges for him -- against him for pretty much dereliction of

20   duty to produce the product that they had paid him for.  And so

21   I told him that the business would be ceased and it's

22   arrangements in producing motions for individuals and that if

23   he could not produce the money, then that was a problem that he

24   was going to have to face individually case by case.

25   Q.    Did you and Mr. Sandler discuss the idea of him raising

1    his objection to your decision to the Court?

2    A.    I did.  I told Mr. Sandler on multiple occasions

3    throughout the course of supervising him that if there was a --

4    an opinion or a directive by myself by the office that he did

5    not like, that he could always take it up with a motion.  He

6    had presented himself as a person who was very well apted in

7    writing pro se motions with the Court.  And if there was a

8    directive that he did not like or care for, that he could take

9    that up with the Court.

10   Q.    Are you aware of whether or not Mr. Sandler did indeed

11   move the Court for relief?

12   A.    He did.  I saw Mr. Sandler three times that day, and on

13   the third occasion that he came down that afternoon, he came

14   and he had a motion in his hand, and he was wavering it, seeing

15   if we would change our position on the matter.  And at that

16   time, my supervisor told him to just file the motion, and the

17   Court will take up the matter at hand.

18   Q.    We previously referred to Government's Exhibit 3.  Do you

19   still have that up there?

20   A.    I do.

21   Q.    Is this the motion which Mr. Sandler filed asking the

22   Court for relief?

23   A.    Yes.

24   Q.    Now, in response to this emergency motion filed by

25   Mr. Sandler, did the Court issue an order?

1    A.    They did.

2    Q.    And I'm going to refer your attention to Government's

3    Exhibit 8.  Do you see that?

4    A.    I do.

5    Q.    Is this the order issued by the Court?

6    A.    It is.

7    Q.    What is the date of this document?

8    A.    It is August 11, 2022.

9    Q.    And I want to go specifically to paragraph 2.  Could you

10   please read that paragraph for us?

11   A.    It says, "Mr. Sandler is directed to cease his consulting

12   and paralegal business, Doc.  Number 95, at 1:00 as directed by

13   his probation officer."

14   Q.    Could you also read paragraph 3?

15   A.    "Mr. Sandler is directed to obey all directives and

16   instructions of his probation officer to the letter."

17   Q.    And are the words "to the letter" italicized?

18   A.    Yes.

19   Q.    Did you notify Mr. Sandler of the existence of this order?

20   A.    I did.

21   Q.    When did you do that?

22   A.    That afternoon after it was filed with the Court.

23   Q.    How did you notify him?

24   A.    I notified him by email, and I believe I texted him as

25   well.

1   Q.   Did you receive an email response from Mr. Sandler?

2   A.   I did.

3   Q.   I'm going to draw your attention to Government's

4   Exhibit 9.  Do you recognize that document?

5   A.   I do.

6   Q.   What is this?

7   A.   It's an email from Mr. Sandler to myself, dated Thursday,

8   August 11, 2022 at 3:45 p.m.

9   Q.   So this would have been the same day that the order came

10  out?

11  A.   That is correct.

12  Q.   Could you read us the first paragraph of that email that

13  Mr. Sandler sent to you?

14  A.   It states, "Judge Watkins order has been issued.  I will

15  follow it and your instructions to the letter.  Thank you

16  for -- thank you for advising me about it."

17  Q.   All right.  So on August 11, 2022 at 3:45 p.m.,

18  Mr. Sandler has promised to follow the Court's order?

19  A.   Correct.

20  Q.   To the letter?

21  A.   To the letter.

22  Q.   At some point, did you become aware of Mr. Sandler

23  breaking that promise?

24  A.   Yes.

25  Q.   And let me ask, were you in this case contacted by an

1    individual named Donna Henley?

2    A.   I was.

3    Q.   What were the circumstances of that contact?

4    A.   I was contacted by another individual and that individual

5    stated that Mr. --  Ms. Henley had spoken to her that

6    Mr. Sandler was continuing business.  Pretty much individuals

7    that had been impacted by Mr. Sandler and who were well aware

8    of his business practices had been following all of the

9    documents that had been filed on CM/ECF.  So they were all

10   aware of Mr. -- Judge Watkins's order on behalf of the Court,

11   and they were well aware of everything that had been going on.

12   People were paying attention to the Facebook groups.  And so at

13   this particular point and time, this woman reached out to

14   another lady that I had been in conversation with and pretty

15   much told me that she had been contacted by Mr. Sandler and

16   that I could contact her directly for further information, and

17   that woman was Ms. Henley.

18   Q.   And did you take that invitation to contact Ms. Henley?

19   A.   I did.  She gave me her phone number, and I contacted her

20   immediately.

21   Q.   Did you speak on the phone with her about her arrangements

22   with Mr. Sandler?

23   A.   I did.  I spoke with her at length that evening.

24   Q.   And what day is this that we're talking?

25   A.   This is August 12.

1  Q.   August 12.  All right.  And at some point as part of that

2  conversation between you and Ms. Henley, did you ask or did she

3  offer to provide messages that she exchanged with Mr. Sandler?

4  A.   Yes.  She stated that she was contacted or they had been

5  communicating during -- through direct Messenger on Facebook,

6  and she stated that she had asked for her refund.  I guess she

7  had heard of the order that was issued the previous day and

8  knew that he wasn't to be conducting business, but that during

9  the course of their exchange, he told her that he didn't have

10  the money to return and so that he would in some way or fashion

11  or form to assist her in getting her motion prepared on behalf

12  of her loved one.

13  Q.   Did Ms. -- okay.  So did Ms. Henley provide you those

14  Facebook messages?

15  A.   She did.

16  Q.   Can I take your attention to Government's Exhibit 10?  Do

17  you have that up there?

18  A.   I do.

19  Q.   And do you recognize that?

20  A.   I do.

21  Q.   Are these the Facebook messages that were provided to you

22  by Ms. Henley?

23  A.   They are.

24  Q.   Let's talk about the first page dated Friday,

25  August 12, 2022.  So this would be two days after the Court has

1  issued the order that we discussed; is that right?

2  A.    This is one day after the Court issued.  My directive came

3  on the 10th.  The Court's directive came on the 11th, and this

4  is the 12th.

5  Q.    Thank you.  Thank you.  So one day after the Court's

6  August 11 order?

7  A.    Correct.

8  Q.    Okay.  One day after Mr. Sandler had sent you that email

9  promising to abide by the Court's order?

10  A.    Correct.

11  Q.    As part of this exchange on August 12, 2022, between

12  Ms. Henley and Mr. Sandler, does she send him, you know, a

13  citation to a criminal code?

14  A.    She does.

15  Q.    What is Mr. Sandler's response to that message?

16  A.    He states, "What is this exactly?  Let's get together by

17  phone tomorrow."  And that is at 3:36 a.m.

18  Q.    Is there a reply by Ms. Henley?

19  A.    She states later on that afternoon at 3:11 p.m. "sorry."

20  Mr. Sandler follows up at 3:12, and he states, "huh?"  And he

21  follow-ups up again, and says, "video.  Okay.  I'm just on

22  phone now" at 3:12.  Later on at 3:13 p.m., Mr. Sandler states,

23  "If you want to pow wow tonight around 8:00 your time, we can."

24  Ms. Henley then responds at 3:49, "I didn't mean to call you."

25  Then there is a JPEG that was sent at 6:38.  And later at 6:38

1    Ms. Henley says, "Please return my money."  Mr. Sandler then

2    follow-ups at 6:39 p.m. and states, "Because of that, I have no

3    money so we're going to do the research together, and you're

4    going to write."  Then at 6:43 he says, "You there?"  She says

5    at 6:50, "Okay."  And again at 6:50, "Sorry.  In the phone."

6    And he follow-ups at 6:50, "We're going to start tonight.  Can

7    you screenshot the post and comments in Bruce's group?"  And

8    she says at 6:51, "Yeah.  Let me look."

9    Q.   Do you know what Bruce's group is?

10   A.   Yes.  Bruce is an individual who conducts business in the

11   same manner that Mr. Sandler was.  He was kind of prison reform

12   consultant as well.  Mr. Sandler was a part of Bruce's group.

13   And along with the numerous complaints that were received, he

14   was kicked out of said group.  And so he was asking for

15   Donna Henley to take screenshots of comments that people were

16   making because, of course, the order that was issued had made

17   it's rounds on Facebook and people were aware that his business

18   was now shutdown.

19   Q.   So on August 12, Mr. Sandler is making comments like

20   "let's get together by phone tomorrow.  If you want to pow wow

21   tonight around 8:00 your time, we can."  Later we're --

22   "because of that, I have no money.  So we going to do the

23   research together, and you're going to write" -- did Ms. Henley

24   tell you what this conversation was about?

25   A.   This conversation was about I believe it was her boyfriend

1 was incarcerated, and they were trying to write a motion on his

2 behalf either to get some First Step Act credit.  I'm not

3 specifically aware of the specifics surrounding his case, but

4 the motion was for some type of compassion release and credit

5 towards his time of incarceration.

6 Q.   Okay.  After you received this document from Ms. Henley,

7 did you contact Mr. Sandler?

8 A.   I did.

9 Q.   What did you tell him?

10 A.   I confronted him.  He denied it initially.  He stated that

11 he had not contacted anybody, and I told him that I had the

12 screenshots from direct Messenger, and then he -- he confessed.

13 I asked him to send me an email of the -- of the prep work, the

14 research that he was going to go over with Ms. Henley, and

15 that's when he sent me an email about the information that they

16 were going to talk about and disclose and pretty much put

17 together a motion on behalf of her loved one.

18 Q.   Was that email dated August 12, 2022 at approximately

19 7:25 p.m.?

20 A.   It is.

21 Q.   And is that Government's Exhibit 11?

22 A.   It is.

23 Q.   All right.  So this email -- if you could just read the

24 first paragraph for us?

25 A.   It says, "There was more that I was going to do here.

1    It's stuff.  I research and stuff I was going to research."

2    Q.   And then this email has a number of attachments; is that

3    right?

4    A.   It is, correct.

5    Q.   And are some of those attachments what appear to be PDFs

6    of cases that were pulled off of LexisNexis?

7    A.   Correct.

8    Q.   Did you also receive an email from Mr. Sandler on

9    August 15, 2022 at approximately 7:56 a.m.?

10   A.   I did.

11   Q.   Is that what's in evidence as Government's Exhibit 12?

12   A.   It is.

13   Q.   Could you read for us the second paragraph of this email

14   that he sent to you?

15   A.   The second paragraph starts off and states, "I should not

16   have responded to Donna Henley even if I had the best

17   intentions in the world.  As you know, I only plan on providing

18   her research, and she was going to write, but that's no excuse.

19   You actually interceded before I had a chance to do that, and

20   it made me realize how serious this is and how important it is

21   to follow my probation officer's directions to the letter.  To

22   that end, when I questioned the next message, the one about

23   Sharese Latin, I turned you -- turned to you for guidance and

24   followed it.  I have a dozen more questions since that time,

25   but I think what would Officer Johnson tell me?  And I follow

1    that.  No communication means no communication.  Cease business

2    means cease business."

3            MR. ANDREU:  Those are all my questions.  Thank you.

4            THE COURT:  Okay.  Let's take about a 10 or 12-minute

5    break right here.  And stand down, and we will come back for

6    cross-examination.  We'll be in recess until about 10 to 5:00.

7            (A recess was taken from 4:35 p.m. until 4:46 p.m.)

8            THE COURT:  Okay.  Go ahead, Mr. Brooke.

9            MR. BROOKE:  Thank you, Your Honor.

10

11                       CROSS-EXAMINATION

12   BY MR. BROOKE:

13   Q.   Officer Johnson, let's first talk about the second

14   violation regarding Cody Ayers.  You said on direct that this

15   is the fiancée of Mr. Sandler; correct?

16   A.   That's what's been disclosed to me that that's their

17   relationship, his fiancée.

18   Q.   And you don't have any reason to doubt that that's their

19   relationship, do you?

20   A.   I have no other information to dispute it.

21   Q.   You permitted Kyle to -- Mr. Sandler to go visit Mr. Ayers

22   in Florida in the month of April; right?

23   A.   I did.

24   Q.   And you said in your violation report that you were

25   directing Kyle to not speak with Mr. Ayers as a corrective

1  intervention; right?

2  A.    That is correct.

3  Q.    And so you didn't have concerns that they were engaging in

4  something illegal or improper or anything like that; right?

5  A.    With regards to prior contact?

6  Q.    They're -- you didn't -- yeah -- you didn't order him to

7  cease contact with him because of some concern that they were

8  doing anything improper?

9  A.    I was concerned.

10  Q.    Okay.  Well, you said on direct testimony that you

11  directed him to not speak with him because of obsessive emails,

12  text messages, phone messages, he's contacting you every day;

13  right?

14  A.    Yes.  His behavior had become manipulative.

15  Q.    And so that was the -- and so that's why you were taking a

16  corrective action was because you wanted that manipulative

17  behavior of him contacting you, phoning you, emailing you,

18  texting you to cease?

19  A.    In part, yes.

20  Q.    Well, what's the other part?

21  A.    The other part was that at that time, Mr. Ayers was still

22  in the custody of the Bureau of Prisons.  And so it is frowned

23  upon for an individual who is still a ward of the Federal

24  Government, the Bureau of Prisons, to maintain such a velocity

25  of contact with Mr. Sandler.

1    Q.    You knew that he was in the Bureau of Prisons when you

2    authorized him Mr. Sandler to go visit him in April; correct?

3    A.    I did.  But I also allowed him to go to visit Mr. Ayers in

4    April because Mr. Sandler had caused such a great disruption at

5    Dismas.  He was causing a complete disdain for how the policies

6    and procedures at Dismas were being conducted.  And so in part,

7    one of the reasons why I allowed him to go to Florida to visit

8    Mr. Ayers was to give the counselors at Dismas a break.

9    Q.    So he was misbehaving at Dismas, so you rewarded him by

10   allowing him to go see Kyle (sic) in Florida?

11   A.    I won't call it a reward.  I would call it a reprieve.

12   Q.    You knew that Mr. Ayers was under the custody of the

13   Bureau of Prisons during that time?

14   A.    That's correct.

15   Q.    You knew that he was under the custody of the Bureau of

16   Prisons after that time until -- up until May 11 when you

17   ordered the cessation of contact?

18   A.    That is correct.

19   Q.    You didn't limit in any way the communications that Kyle

20   could have with Mr. Ayers during that time?

21   A.    Up until that point.  Up until around April, his contact

22   with Mr. Ayers was not a pause for concern.  What became a

23   pause for concern was that Mr. Sandler was using his

24   relationship with Mr. Ayers, using consistent communication via

25   emails, text messages, and phone calls, and also manipulating

1  his way down to Florida by contacting the officers down in

2  Florida.

3  Q.   Okay.  So you're talking about emails, phone messages, and

4  calls.  That's to you; correct?

5  A.   That's to the offices even in Florida.

6  Q.   Okay.  That's to you and to the officers in Florida?

7  A.   That is correct.

8  Q.   Not to Mr. Ayers?

9  A.   I'm not aware of the contact and the variety of contact

10  that he was having with Mr. Ayers.  But based off of the

11  relationship that they had, based off of him using these

12  measures to manipulate me and the officers in Florida; I did

13  use the no contact with Mr. Ayers as a corrective intervention.

14  Q.   So eventually he gets told you can't go to Florida; right?

15  A.   He goes in April.

16  Q.   No.  That's not my question.  My question is -- I'm sorry.

17  My question wasn't clear actually.  He eventually gets told he

18  can't move jurisdictions?  Can't move down to Florida; correct?

19  A.   Correct.

20  Q.   And after that time, he's not having any contact or

21  problems with the Florida office, I assume?

22  A.   I'm not aware because after I had my -- my conversation

23  with them, I didn't follow up.

24  Q.   Okay.  So not to your knowledge?

25  A.   Yes.

1    Q.   You didn't feel the need to take any further corrective

2    action regarding his emailing you, phoning you, texting you

3    obsessively after this May 11 intervention; correct?

4    A.   Can you repeat that again?

5    Q.   Yeah.  You didn't feel the need to take any further

6    corrective action regarding his emailing you, texting you,

7    phoning you obsessively after you gave him the corrective

8    action on May 11?

9    A.   No.  The message was clear.

10   Q.   And I'm sure that -- I mean, he's my client.  He talks to

11   me a lot.  I'm sure he still talks to you a fair amount.

12   A.   Absolutely.  It never stopped.

13   Q.   But it wasn't to the point --

14   A.   But it wasn't excessive.  It wasn't overbearing.

15   Q.   Okay.  Thank you.  Thank you.  Now, let's talk then about

16   the third violation.  Now, he told you that he had been

17   engaging as a paralegal in prison; right?

18   A.   Correct.

19   Q.   And he had been assisting other individuals in prison --

20   A.   Correct.

21   Q.    -- in writing their motions?

22        He showed you -- or, well, I don't know if he showed you.

23   He told you that he has a paralegal certificate; right?

24   A.   Yes, he did.

25   Q.   And as you said on direct testimony, your office

1   ultimately approved his doing this business, this paralegal

2   business, in June of this year; right?

3   A.   Correct.

4   Q.   Now, you had been contacted by the U.S. Attorney's Office

5   in May because they had received an anonymous phone call

6   complaining about Mr. Sandler and his paralegal business;

7   right?

8   A.   Correct.

9   Q.   And you had received that complaint.  Did you talk to him

10  about that?

11  A.   At that point in time, I believe it was addressed, but

12  part of the solution was for him to follow up with all of the

13  motions in a spreadsheet so I can keep track.  It was

14  anonymous.  The person wasn't named so there's no way I could

15  verify.

16  Q.   That makes sense.  So you approved it in June, and at that

17  point, one of the conditions you said is that you've got to

18  every month show me who it is you're doing business with, show

19  me the motions that you are filing?

20  A.   Correct.

21  Q.   Did he do that?

22  A.   He did.

23  Q.   So you got -- I'm not sure if it was on the 1st or if he

24  was always exactly to the dot on time, but he always sent you

25  the motions that he said he was preparing and filing?

1    A.    Within the first week of the month, yeah.

2    Q.    Thank you.  Now, obviously we get to the point then when

3    things have deteriorated; right?

4    A.    Correct.

5    Q.    And you give him the directive on August 10 that he needs

6    to cease the business?

7    A.    Correct.

8    Q.    And then, of course, as you testified, he files a motion,

9    the Judge enters an order saying, Hey, follow your probation

10   officers order to the letter; right?

11   A.    Correct.

12   Q.    And then he has the communications with Ms. Henley that

13   you've talked about?

14   A.    Yes.

15   Q.    Now, he then in the email that you read from Government's

16   Exhibit 12, he reference -- you -- he references in his email

17   another individual, and this is Latin Sharese Antoinet.  Do you

18   recall that name?

19           THE COURT:  Say that again.

20           MR. BROOKE:  Last name of -- well, I believe it's last

21   name of Latin, L-a-t-i-n, Sharese, S-h-a-r-e-s-e, Antoinette,

22   A-n-t-o-i-n-e-t.

23   Q.    (Mr. Brooke, continuing:)  Do you recall him mentioning

24   this person?

25   A.    I believe I know what this is in reference to, yes.

1    Q.   Okay.  What is it in reference to?

2    A.   So on Friday when I alerted him that I was aware of his

3    business dealings, we had an in-depth conversation.  On that

4    Saturday, we had maybe a three hours long conversation that

5    morning.  I believe later on that afternoon Mr. Sandler

6    forwarded me an email and that email -- if I'm correct, and I'm

7    not -- I don't have the lead email to that -- but if I'm

8    correct, I believe that email was asking -- Ms. Latin may have

9    been asking for the motion that Mr. Sandler wrote on her behalf

10   or on her loved one's behalf.

11   Q.   Fortunately, I've got the paperwork.  So why don't we take

12   a look at it directly.

13            MR. BROOKE:  May I approach, Your Honor?

14            THE COURT:  You may.

15            MR. BROOKE:  I'm going to hand you what's been marked

16   as Defendant's Exhibit -- Defendant's Exhibit 5.

17            I'm going to give you the original, and I'm going to

18   do my best to remember to get it back.

19            Your Honor, may I approach?

20            THE COURT:  You may.

21   Q.   (Mr. Brooke, continuing:)  All right.  This is a two-page

22   document.  The first page appears to be an email from

23   Mr. Sandler to you, and the second page appears to be an email

24   from Ms. Latin to Mr. Sandler; is that correct?

25   A.   That is correct.

1  Q.    Do you recognize these documents?

2  A.    I recognize Mr. Sandler and -- I recognize both.  I

3  recognize both.

4  Q.    Okay.

5        MR. BROOKE:  Your Honor, I would move Defendant's

6  Exhibit 5 into evidence.

7        MR. ANDREU:  No objection.

8        THE COURT:  Admitted.

9  Q.    (Mr. Brooke, continuing:)  So looking at the second page,

10  the email from Ms. Latin to Mr. Sandler, what is she asking

11  for?

12  A.    She states, "I understand your business had to cease

13  operations on August 10, 2022.  Can you please be so kind as to

14  mail all of the paperwork sent to you for the preparation of

15  and the completed work to" --

16  Q.    You don't need to read the address but to a person; right?

17  A.    Yes.

18  Q.    Thank you.  And what is the first page, the email from

19  Mr. Sandler to yourself?

20  A.    This is an email from Mr. Sandler to myself on Saturday,

21  August 13 at 7:55 p.m. It states, "I would like to know if it's

22  okay to comply with the attached request.  This particular

23  piece of business was completed on August 5, 2022.  This is not

24  a Facebook client nor referral.  This is a referal completely

25  outside of Facebook."

1  Q.   And so he's asking you if he can comply with this request

2  from her to return the paperwork.  What's your directive to him

3  as to that?  Do you give him a directive?

4  A.   I believe it was verbal.  We had spoke multiple times that

5  day.

6  Q.   Sure.

7  A.   I told him, no.

8  Q.   And to your knowledge, did he comply with that directive?

9  A.   I have no other information to dispute that.  I -- I

10 don't -- I would believe that at that moment the message was

11 clear to Mr. Sandler to cease business and that he did, but I

12 don't have any information to -- to prove.

13        MR. BROOKE:  Your Honor, may I approach to retrieve

14 the exhibit?

15        THE COURT:  You may.

16 Q.   (Mr. Brooke, continuing:)  So after you told him to cease

17 the business, you gave him another directive; right, which was

18 to get a job; right?  To get a paying job?

19 A.   Correct.

20 Q.   And you told him he needed to do that within about ten

21 days; is that right?

22 A.   I don't remember specifically.  I know it was like within

23 two weeks -- like get a job within two weeks.

24 Q.   And how quickly did he get a job?

25 A.   He got one that following Monday/Tuesday.  I think he had

1    the job.  I don't think he started on Monday, maybe Tuesday.

2    Q.   So a couple of days?

3    A.   Yeah.  Within.

4    Q.   Delivering pizzas?

5    A.   At Papa John's.

6    Q.   And to your knowledge, did he continue that job up until

7    the day that he was arrested?

8    A.   That is correct.

9    Q.   Okay.

10           MR. BROOKE:  No further questions, Your Honor.

11           THE COURT:  Redirect?

12           MR. ANDREU:  Yes, sir.

13

14                    REDIRECT EXAMINATION

15   BY MR. ANDREU:

16   Q.   I want to talk to you briefly about this interaction

17   between you and Mr. Sandler about Sharese Latin.

18   A.   Okay.

19   Q.   Before I do, do you recall -- you testified earlier when

20   we were talking about Mr. Sandler's restitution, do you recall

21   that?

22   A.   Yes.

23   Q.   And you testified that he hadn't -- you know, he was in

24   arrears for the months of June and July on restitution;

25   correct?

```
 1    A.   Correct.
 2    Q.   And then he wanted to go somewhere; correct?  He wanted to
 3    go to Florida?
 4    A.   Correct.
 5    Q.   And you told him that if he wanted to go to Florida, what
 6    he needed to do was make his restitution payment?
 7    A.   He needed to be compliant with all conditions of
 8    supervision.
 9    Q.   And so in that situation, based upon him wanting
10    something, he then made his restitution payment?
11         MR. BROOKE:  Your Honor, objection.  Argumentative.
12         THE COURT:  Sustained as to argumentative.
13    Q.   (Mr. Andreu, continuing:)  Let's go to this email you were
14    asked about with Ms. Latin.  This email -- I just want be
15    clear -- is dated August 15 of 2022?  I'm referring to
16    Government's Exhibit 12.
17    A.   Yes.
18    Q.   All right.  This was after you had given him clear
19    instruction not to continue his business?
20    A.   Correct.
21    Q.   And was this also after the Court had issued an order for
22    him not to continue his business?
23    A.   It was.
24    Q.   This is also after -- if I'm correct -- he failed to obey
25    those orders and had the contact with Ms. Henley?
```

1   A.   That is correct.

2   Q.   But then August 15 rolls around and on this email he notes

3   that he turned for you for guidance related to Ms. Latin; is

4   that right?

5   A.   That is correct.

6   Q.   And that guidance that he turned to you on is, what's

7   found at Defense Exhibit 5.  He did that on August 13 of 2022?

8   A.   That is correct.

9   Q.   Now, at this point when you get this August 15, 2022 email

10  from Mr. Sandler, does he want something?

11  A.   He wants to know if he can comply by the inquiry about

12  submitting the documents to Ms. Latin.  My response to him was,

13  No.  That the business was ceased.  And unfortunately since the

14  business was cease and that business ceased operations on

15  August 10, any information that she didn't have by that time,

16  she could no longer get.  The business was no longer in

17  operations and him submitting those documents to her would be

18  continuing the practice of business, even though potentially

19  the work was done prior to the business being ceased.

20  Q.   And so at this point, he's demonstrating compliance with

21  your order as it relates to Ms. Latin?

22  A.   Yes.

23  Q.   And as part of this August 15, 2022 email he sent to

24  you -- and I just want to read from the fifth paragraph down,

25  do you see where it says, "I am begging you to give me a

1  two-week trial to watch me from a distance, do exactly what I

2  am supposed to do?"

3  A.   Yes.

4  Q.   And then three paragraphs below that, there's a sentence

5  that says, "I ask this for two reasons.  First, because I

6  really don't want this violation.  I don't want to go to

7  Court."  Do you see that?

8  A.   Yes.

9  Q.   And is this part of that same email where he's

10 acknowledging compliance as it relates to Ms. Latin?

11 A.   Yes.

12 Q.   Thank you.

13       MR. ANDREU:  That's all my questions.

14       THE COURT:  Okay, ma'am.  You can stand down.

15     (The witness was excused at 5:03 p.m.)

16       THE COURT:  Does the Government have any other

17 evidence?

18       MR. ANDREU:  No, sir.

19       THE COURT:  All right.  What says the defendant?

20       MR. BROOKE:  I would like to call one witness,

21 Rena Ross.

22       THE COURT:  Okay.

23

24              **RENE ROSS,**

25       The witness, having been duly sworn to speak the

1  truth, the whole truth and nothing but the truth, testified as

2  follows:

3

4                          DIRECT EXAMINATION

5  BY MR. BROOKE:

6  Q.  Ms. Ross, could you please state your name and job title

7  for the record.

8  A.  My name is Rene Ross.  I'm the chief investigator for the

9  Federal Defender Office, Middle District of Alabama.

10  Q.  And briefly, what do you do in that role?

11  A.  I assist the attorneys in working with clients that have

12  been appointed to our office.  It involves interviewing our

13  clients, locating and interviewing witnesses, support for

14  whatever the attorneys may need.

15  Q.  And have you been working on the case of Mr. Kyle Sandler?

16  A.  I have.

17  Q.  And have you done an investigation as part of that case at

18  my request and direction?

19  A.  I have.

20  Q.  I'm going to approach and give you a document that's

21  marked as Defendant's Exhibit 6.

22          MR. BROOKE:  May I approach, Your Honor?

23          THE COURT:  You may.

24  Q.  (Mr. Brooke, continuing:)  Ms. Ross, do you recognize this

25  document?

1    A.    I do.

2    Q.    What is it?

3    A.    It is a list of clients from the month of June that

4    Mr. Sandler said that he had been working on.

5    Q.    And -- and where did you get this document from?

6    A.    It was in a -- Mr. Sandler provided us logins for various

7    email accounts that he -- or an email account that he had, and

8    this was part of the information that was there.  And I'm not

9    sure if we got it from probation as well.

10   Q.    So is this one of the lists -- the monthly lists that he

11   would give to Officer Johnson?

12   A.    Yes, that's correct.

13         MR. BROOKE:  We would move Defendant's Exhibit 6 into

14   evidence.

15         MR. ANDREU:  No objection.

16         MR. BROOKE:  I would note that I altered Exhibit 6

17   slightly.  I redacted the contact info.  The telephone numbers

18   are all "XXXX."  It was actually originally a spreadsheet with

19   their phone numbers.  Those contact phone numbers have been

20   redacted.

21         THE COURT:  Ms. Ross, did you prepare this document?

22         THE WITNESS:  No, Your Honor, I did not.

23         THE COURT:  Do you have any idea what dates are

24   related to when this document was given to the probation

25   officer?

1          THE WITNESS:  So in how we received it, Your Honor,

2     there were spreadsheets that were labeled June, July, August,

3     and this was one that was labeled June.

4          THE COURT:  Okay.

5          THE WITNESS:  Uh-huh.

6     Q.   (Mr. Brooke, continuing:)  Now, did you go about doing

7     anything with the information listed in this spreadsheet?

8     A.   I did.

9     Q.   What did you do?

10    A.   Out of the individuals that were listed on the

11    spreadsheet, I randomly just selected some of them to see what

12    other additional information I could find.

13    Q.   How many of them did you randomly select?

14    A.   Approximately 20.

15    Q.   Now, you say you randomly selected them.  Did you -- did

16    Mr. Sandler have any input whatsoever in the people that you

17    selected?

18    A.   No, he did not.

19    Q.   What did you do to locate additional information about

20    those 20 individuals?

21    A.   One thing that I did after randomly selecting the names, I

22    looked at the information that Mr. Sandler provided to us from

23    his Google account where he had drafts of the motions that he

24    prepared.  So I looked there to see that the drafts were there,

25    and then I looked up these individuals on PACER to see if the

1  motions had been filed that Mr. Sandler had drafted.

2  Q.   And what did you discover by doing that comparison?

3  A.   They had been filed in various courts on PACER.

4  Q.   Okay.  And so they were filed -- were they filed -- was

5  Mr. Sandler's name on them?

6  A.   No.  They were all pro se motions.

7  Q.   But they were identical copies from what you saw on the

8  Google Drive versus what you found in PACER?

9  A.   Yes, that's correct.

10  Q.   Now, I asked you about these where Mr. Sandler had no

11  input.  Did Mr. Sandler identify some individuals that we

12  should contact?

13  A.   He did.

14  Q.   Three such individuals?

15  A.   Yes, that's correct.

16  Q.   One of those was Victor Atisha; right?

17  A.   Yes, that's correct.

18  Q.   Did you contact Victor Atisha?

19  A.   I did.

20  Q.   What did Victor Atisha say to you?

21  A.   He stated that he did not know Mr. Sandler personally.  He

22  had heard of him -- or heard of him through word-of-mouth, and

23  Mr. Sandler had prepared a pro se motion for him.  He was

24  requesting a sentence reduction in his case, and Mr. Sandler

25  prepared the motion for him.  He was granted relief with the

1    motion that was filed, and he was pleased with the work that

2    Mr. Sandler did for him.

3    Q.   Then there was a Sandy Bulsito?

4    A.   Bulsito, yes.

5    Q.   Thank you.  Did you speak with this individual?

6    A.   I did.

7    Q.   And what did they tell you?

8    A.   Very similar to what the prior individual had said.  They

9    had heard of Mr. Sandler through word-of-mouth.  He did the

10   work for them.  As with the prior gentleman I just named, this

11   individual as well was given some reduction in sentence after

12   his pro se motion was filed and granted by the Court.

13   Q.   And then the third individual was Ronald Little?

14   A.   Yes, that's correct.

15   Q.   What did Mr. Little tell you?

16   A.   The same.  The only difference is Mr. Little stated that

17   he met Mr. Sandler while they were in prison together, but

18   Mr. Sandler was released prior to Mr. Little.  But the same

19   thing.  He was looking for a reduction in his sentencing, and

20   he also was granted relief based on the pro se motion that was

21   filed.

22   Q.   And finally, I'd like to approach and hand you a document

23   that's labeled Defendant's Exhibit 3.

24             MR. BROOKE:  May I approach, Your Honor?

25             THE COURT:  You may.

1    Q.   (Mr. Brooke, continuing:)  Do you recognize this document?

2    A.   I do.

3    Q.   What is it?

4    A.   It is a certificate -- a legal assistance paralegal

5    certificate that was issued to Mr. Sandler.

6    Q.   And what was the date that it was issued?

7    A.   The 20th day of April, 2021.

8    Q.   And it was issued from Blackstone Career Institute; is

9    that right?

10   A.   Yes, that's correct.

11        MR. BROOKE:  Your Honor, I'd move Defendant's

12   Exhibit 3 into evidence.

13        THE COURT:  Any objection?

14        MR. ANDREU:  No, Your Honor.

15        MR. BROOKE:  No further questions for this witness.

16   May I approach to collect the exhibits?

17        THE COURT:  Yes.

18        Mr. Andreu?

19

20                    CROSS-EXAMINATION

21   BY MR. ANDREU:

22   Q.   Good afternoon, ma'am.

23   A.   Good afternoon.

24   Q.   This document, Defense Exhibit 6, this is a spreadsheet

25   that you retrieved just for the month of June?

1    A.    Yes, that's correct.

2    Q.    Now, it was your understanding that Mr. Sandler was

3    providing services outside the month of June; is that right?

4    A.    That is correct.

5    Q.    But you didn't pull spreadsheets for either -- any of the

6    other months?

7    A.    I did not.

8    Q.    You contacted only -- well, let me back up.  This

9    spreadsheet has 32 names?

10    A.    That's correct.

11    Q.    And out of those 32 individuals, you only contacted 3?

12    A.    No, sir.  I corrected -- I contacted -- I'm sorry.  I

13    looked up approximately 20 of the cases that were on that June

14    spreadsheet, and Mr. Sandler had mentioned to Mr. Brooke that

15    there were additional people that may or may not have been on

16    that June spreadsheet that we could contact as well.  And so I

17    verbally spoke with the three that I mentioned, but the 20 that

18    I looked, what I did was compared what was in the information

19    Mr. Sandler provided to us compared to what had been filed in

20    different courts on those individuals behalves or by those

21    individuals.

22    Q.    Right.  And that was my understanding.  So for those 20,

23    you didn't contact them?

24    A.    No, I did not.

25    Q.    You just looked to see that there was actually a motion

1  filed on their behalf?

2  A.   Yes.  I compared what was in his records with what was

3  filed to see if it were -- if it were the same motions.

4  Q.   You have no idea whether or not those 20 people were

5  pleased with the services that were rendered?

6  A.   I do not.

7  Q.   There's phone numbers on this spreadsheet, are there not?

8  A.   There were, yes, sir.

9  Q.   So you had the phone number to contact them had you wanted

10 to?

11 A.   Yes.

12 Q.   The three people that you did decide to contact were

13 handpicked by Mr. Sandler?

14 A.   He did mention those were ones that would be willing to

15 speak with us, yes, sir.

16 Q.   And those three were overall happy with the services?

17 A.   Yes.

18 Q.   Did you let them know that Mr. Sandler was being sentenced

19 today?

20 A.   I did not say today.  We were actually supposed to be in

21 last week, and I did inform them that he had a court proceeding

22 that was pending.

23        MR. ANDREU:  Thank you.  That's all my questions.

24        THE COURT:  Okay.  Thank you, ma'am.  You can stand

25 down.

1        THE WITNESS:  Thank you.

2        MR. BROOKE:  Your Honor, we have nothing further to

3   offer in terms of exhibits or evidence.

4        THE COURT:  All right.  So I'll take argument from the

5   Government first.

6        MR. BROOKE:  Your Honor, I would observe I think

7   that -- just to make sure absolutely sure -- Mr. Sandler would

8   like to allocute, but I assume you would want that after

9   argument?

10        THE COURT:  That's correct.

11        MR. BROOKE:  Okay.  Thank you, Your Honor.

12        MR. ANDREU:  Your Honor, as the Court noted at the

13   beginning, the guideline range in this case is 3 to 9 months,

14   and the statutory maximum under Section 3583(e) is 24 months.

15   The Government is asking for a 24-month sentence in this case.

16   I recognize that that's a significant upward variance from the

17   guideline range, but given the 3553(a) factors, given

18   Mr. Sandler's conduct, that sentence is what is appropriate in

19   this case to address the fact that Mr. Sandler is a danger to

20   the community as well as to address the fact that Mr. Sandler

21   will not follow conditions of supervision.

22        So let's start with that, the fact that Mr. Sandler

23   will not follow the conditions of supervision.  Mr. Sandler has

24   been given opportunity after opportunity in this case.  If you

25   go back to his original sentence where he was ordered to pay

1    about $1.9 million in restitution, he was sentenced at the

2    bottom of the guidelines by the Court.  Since he's been on

3    supervision, Officer Johnson has given him opportunity after

4    opportunity to succeed.  You heard testimony about how she's

5    getting bombarded by him over a period of time by texts and

6    emails.  She's telling him that he can't go to Florida.  He's

7    going around her, contacting the probation office down there.

8    He wants to get down there to see his -- his fiancée, but she's

9    giving him opportunities to succeed.  She's not -- there wasn't

10   a petition filed right away in this case.  Officer Johnson was

11   working with him.  And he's making promises and promises to

12   follow direction.

13          She worked with him by allowing him to go to Florida

14   and see Mr. Ayers for a period of time in April, but then she

15   gives him instruction that he cannot go to Florida, that he

16   cannot have contact with Mr. Ayers.  And rather than following

17   that, the Government's -- he's admitted, and the Government has

18   introduced evidence that he continued to contact Mr. Ayers via

19   at minimum via Facebook Messenger.  The Court, as it relates to

20   the paralegal services in this case -- let me back up.

21   Officer Johnson also gave him explicit instructions related to

22   that.  As it relates to Mr. Ayers, she had had to write down

23   word-for-word exactly what she was going to tell him because it

24   was clear that he would -- as she put it -- sort of manipulate

25   what she said and not follow instruction.

1          So then fast-forward to the other violation with the

2    paralegal services.  In August, she gives Mr. Sandler explicit

3    instruction that he has to cease following -- or cease

4    conducting his paralegal business.  He's dissatisfied with that

5    and files a document with the Court asking for emergency

6    injunctive relief.  The Court -- he withdraws that, but the

7    Court issues an order saying that he is directed to cease his

8    consulting and paralegal business as directed by his probation

9    officer.  Also stating Mr. Sandler is directed to obey all

10   directives and instructions of his probation officer italicized

11   for emphasis to the letter.

12          I think this is an extraordinary document here because

13   it's not the norm where a Court has to issue an order telling

14   someone to follow the instructions of their probation officer.

15   In this case, he's been explicitly instructed his by probation

16   officer to follow the order.  The Court has taken what I would

17   characterize as an extraordinary step directing him to follow

18   the directions of his probation officer to the letter.

19   Mr. Sandler understood that.  He recycled that language in

20   providing an email to Officer Johnson promising to follow the

21   Court's order to the letter.

22          In less than -- in 24 hours from that, he's contacting

23   one of his clients, as was introduced into evidence, in

24   discussing this -- the idea of meeting up with her, and they'll

25   research together, and she'll write.  Within 24 hours, he's

1  work -- he's finding a workaround to not obey the Court's order

2  to not obey the order of probation.

3      This Court should have no faith whatsoever that if

4  Mr. Sandler is returned to supervision that he's going to obey.

5  He's demonstrated consistently that he will not obey.  Now,

6  he's willing to obey when it can benefit him.  When you look at

7  the restitution that was ordered and he was in arrears and he

8  wanted to go to Florida and to see his fiancée.  He was told

9  you need to start catching up with your supervision -- or with

10  your restitution, and so he makes a restitution in that --

11  makes a restitution payment in that situation because there was

12  something that he wanted.

13      Here with the order to cease the paralegal business,

14  he continued it within 24 hours, as I mentioned, but then when

15  he wanted something, he wanted this hearing to go away and

16  didn't want to go to Court.  He then tries to demonstrate that

17  there is someone else who wanted something.  Well, he didn't do

18  anything for them so he's really trying hard.  At some point,

19  you know, the promises don't mean anything, and I believe we're

20  well past that point in this case with Mr. Sandler.

21      Mr. Sandler is a scammer.  He's a scammer and a liar

22  and neither one of those things are going to change.  Looking

23  back at the initial case here -- and I'm just referring to a

24  few sentences from Document 62, which is a memorandum opinion

25  and order in the record issued by the Court -- notes that from

1  2015 through 2016, Mr. Sandler defrauded more than 70 victims
2  out of nearly $2 million by convincing them to invest in his
3  new company Roundhouse, LLC.
4           The Court noted some of the comments of the victims in
5  that case, and the Court cited to the initial presentence
6  investigation report.  For multiple offenses underlying
7  Mr. Sandler's convictions are serious crimes that financially
8  and emotionally damaged the lives of dozens of individuals.
9  There were several victim impact statements that were
10 submitted, and I just want to read a couple of them.
11          "Mr. Sandler used my $22,500 for his own expense.  His
12 lies are convincing."  Another one, "I've experienced a loss of
13 investment funds for my retirement."  Another statement, "The
14 loss of money created anxiety and reduced my trust in capital
15 markets."  Another one, "Being a victim has lowered my bar and
16 trust of any opportunity to invest.  Much like being raped or
17 broken into and being very vulnerable."  Another one says, "We
18 lost not only the $30,000, but the potential income that
19 $30,000 would have generated in our retirement account.
20 Mr. Sandler hurt us financially and emotionally."
21          And here, he's right back at it.  He's on supervision
22 for a matter of months, and he started this new business and
23 right away, the probation office is getting complaints from
24 various people about how Mr. Sandler is not -- not fulfilling
25 his obligations and not doing the work and taking their money.

1          A sentence of 24 months is not going to deter

2    Mr. Sandler.  The Court should have no faith that that's going

3    to happen neither, but at least it will spare the citizens of

4    this community 24 months from Mr. Sandler's scams.  When he

5    gets out, there's no doubt he's going to go right back to it.

6    He'll find a new victim and a new scam.  So there's only so

7    many of the 3553(a) factors that the Court can really address

8    given the maximum sentence in this case.  But it's the position

9    of the United States that a sentence of 24 months; although,

10   it's an upward variance, again will at least save the members

11   of the community that much time from Mr. Sandler's scams.

12          THE COURT:  Mr. Brooke?

13          MR. BROOKE:  Judge, I thought I was coming here for a

14   supervised release revocation.  I didn't realize I was coming

15   in here for a resentencing of the 1.9-million fraud that

16   already happened that he was sentenced to that he was sentenced

17   to a sentence that the Government agreed with under a

18   11(c)(1)(C) plea.

19          We are here on two violations and two violations only.

20   That he failed to stop communicating with his fiancée, which he

21   absolutely admits that he failed to do.  And if, Your Honor,

22   thinks that you need to punish him because he continued to

23   communicate with his fiancée, you know, we don't have a defense

24   for that.  You're going to have to do that because I think that

25   on that one the Government is right.  I think on that one it --

1    it's going to be hard for him ever to comply with an order that

2    he not contact his loved one.

3          Now, I will point out that the reason that

4    Officer Johnson gave for why she was doing that corrective

5    action was to cease his conduct visa vie her.  She wasn't

6    concerned about him contacting Mr. Ayers per se.  She was

7    concerned with what he was doing as to her.  Too many emails,

8    too many phone calls, too many texts.  She had to deal with him

9    once a day, every day, rain or shine.  That she acknowledged.

10   Didn't cease completely, but it wound down, became manageable,

11   became something she could deal with.  Her corrective action

12   worked.  The fact that he continued to contact his loved one is

13   not a problem per se.  She acknowledges herself it was a

14   corrective action to get his behavior under control and that

15   worked.

16         About him following -- before we get to following

17   orders -- well, no.  Let's talk about that first.  I mean

18   what's he to do?  He's a guy who's openly admitted that he's

19   defrauded people of $1.9 million.  He knows that.  He knows the

20   reputation that he has and now he started up a new business.

21   This is a business that he was doing -- work that he was doing

22   while he was in the Bureau of Prisons.

23         I forgot to move an exhibit, Your Honor.  I forgot to

24   move an exhibit.  It's an exhibit of Bureau of Prisons' policy,

25   which says explicitly that inmates can help other inmates with

1  their legal work unless there's a security concern that would

2  justify not allowing that.  And I'd would ask, Your Honor, to

3  take notice of that.

4        We will know that jail house lawyers do that work in

5  the prisons.  He gets out.  He starts doing this work just as

6  he done before, but now he's charging money for it.  Some

7  customers aren't happy.  But he goes to Ms. -- Officer Johnson

8  and he says, This is what I want to do.  I want to do it

9  full-time.  Is that okay?  And what does she say?  She says,

10 Yes, that's fine.  There are conditions.  Comply with the

11 conditions.  Tell me who your clients are.  Show me a copy of

12 the work.  He does that.  He sends her copies of everything

13 that he's prepared for individuals.  He sends her their names.

14 He sends her the amount that he's charging.

15       Now, he has a business practice that's -- that is one

16 where people pay up front.  He does the work.  So we looked in

17 June.  Everything looked fine then.  We're not saying we

18 checked every single one, but let's not say that this is just

19 some scheming fraud like the Government is suggesting.  The

20 fact that people are unhappy with the results of compassion

21 release motion does not a fraudster make.  He did the work that

22 he said he would do.  We know that.  It's just that people were

23 not satisfied with the results.

24       So then we get to the order and the directive that

25 he's not to do this any further.  And Ms. Henley reaches out to

him, cites a code section.  He messes up.  I don't deny it, but
what was he supposed to do?  This person -- he had taken their
money.  He had no money to return to them.  He was under a
Court order to not work on this anymore.  He says, Well, at
least if I can give her the research, I'm helping her out while
also trying to comply with the Court order.  We admit that was
a mistake.  But what does he do the next time?  The next time
he reaches out to Officer Johnson.  She says, You can't even
return the original documents that someone sent you.  That
would be a violation.  So what does he do?  He follows the
order.  He follows the directive.  He goes out and gets a job
delivering pizza.  That's what he's been doing for the weeks
before he gets arrested.

         The Government looks at him and says, Once a scammer,
always a scammer.  I look at him and see a guy who was trying,
and he messed up.  But he spent 35 -- give or take days now --
in custody, and that is enough.  We don't have any basis for
sentencing him to 24 months.  The Government's argument that he
was scamming individuals is built entirely on an anonymous tips
that they were getting information of problems.  That's the
only evidence you heard and that evidence justifiably led to
Officer Johnson directing him to shut the business, and he
didn't comply for one day with one individual and then he did.

         That is what he's doing now.  He's -- well, he was.  I
mean he spent the last month and a half in custody -- well, 35

days.  I should -- more than a month.  I'm not sure if it's

exactly 35 days.  He spent more than a month in custody now

over this.  And I submit that that is more than enough for what

he was doing.  At all times, he was acting under the direction

of probation.  He was doing what they asked him to do.  He was

doing his best, and he made one mistake, and really I submit to

the Court, the only mistake that even justifies his revocation,

which is communicating with Ms. Henley.

       And I admit that that was a mistake, but I think that

in the bran [sic] scheme of things, to suggest that that

warrants even a three-month sentence much less 24;

misunderstand what we're trying to do with supervised release.

We're trying to get people reintegrated, we're trying to get

them to stand up on his feet, and he was trying to do

everything he could to try to get that money together to be

paying people off.

       If, Your Honor, is concerned, there are things you

could do.  If you want to tell him that he can't touch a

computer for the next 24 months, you know, maybe that's

appropriate -- I mean if you're really concerned that he was

scamming individuals here.  But if someone wants -- if the

Governments wants to bring a wire fraud case, they're welcome

to do so.  That's not what this is.  That's not what this is.

And the suggestion that 24 months would ever be justified here,

I -- well, I'll rest on what I've said.

1          THE COURT:  Mr. Sandler, your lawyer says you want to
2    allocute.  Is there something you want to tell me?
3          THE DEFENDANT:  Should I do it right here or over
4    there?
5          THE COURT:  Oh, you can do it from there if you'll
6    like.
7          THE DEFENDANT:  If -- if you don't mind, Your Honor, I
8    have a couple of things that I'd like to say.  It might take a
9    minute.
10          THE COURT:  Take a minute.
11          THE DEFENDANT:  Is that okay, sir?
12          THE COURT:  Yes.
13          THE DEFENDANT:  Okay.  First off, I want to thank you
14    for seeing me so quickly after we had to reschedule.  I know
15    that you take as much time with each individual defendant, and
16    I was here waiting, and I -- I thank you for that.
17          First off, I wanted to apologize.  I never thought
18    that I would be back in your courtroom again, but here I am, so
19    I apologize.  Apologies for the most part of -- I'm going to
20    get into that in a minute.  When I stood here before you in
21    2019 for sentencing, you said three things that really stood
22    out.  The first one was that I needed to learn how to keep the
23    dog in the cage.  And because the dog creeped out of the cage
24    is why we're back here today, I don't want ever want the dog to
25    come out the cage again.

1    The next thing is that I needed to take advantage of

2  the programming and opportunities that were afforded to me by

3  the Bureau of Prisons.  And to that end, I took over 50

4  programs took -- or taught over 50 programs in the Bureau of

5  Prisons and held two positions of trust.  I was the staff cook

6  for two years, meaning that every meal that the staffed had at

7  FPC Montgomery for lunch, I cooked and prepared.  And then I

8  was the PM education clerk.  And then with the help of my

9  mom -- the financial help of my mom, I took the Blackstone

10  paralegal course over 18 months and aced it.  My lawyer here,

11  Mr. Brooke, has not only the certificate, but my mom actually

12  emailed him the transcript, and I passed with flying colors.  I

13  didn't just learn about criminal law, though.  I learned about

14  title law, real estate law, every type of law.  And, yeah, I

15  was a jail house lawyer.

16    As Ms. Johnson pointed -- as Officer Johnson pointed

17  out, I put seven or eight motions before you, Your Honor.  And

18  I took those skills that I learned through the Blackstone

19  paralegal and through being a jail house lawyer, and at the end

20  of May, I asked Officer Johnson if I could start my own

21  paralegal and prison consulting firm, and she said, Yes.  So

22  that's when we came up with the report.  And as a supplement to

23  my monthly report, every single month actually before I went

24  full-time, I believe I started the reports in April.  I had

25  every single client, every single thing that I did, how much I

1    charged, where they paid, how much they paid, et cetera,

2    et cetera.  Every month without failing.

3         In May -- in May somebody anonymously called not

4    Officer Johnson, but the U.S. Attorney's Office and accused me

5    among other things of practicing law without a license.

6    Officer Johnson called me, and we had an hour long conversation

7    on the phone.  I asked her if I needed to stop with my

8    business, she said, No, so I continued.  All of the efforts

9    that I made in prison ultimately resulted in me leaving prison

10   23 months earlier.  My original out date was January 24 --

11   January 21, 2024.  And as you know, Judge Watkins, I left -- I

12   left federal prison on February 16, 2022 -- 23 months early to

13   go home, but I really wasn't going home.

14        On February 15 you, Your Honor, signed an order

15   committing me to the halfway house because I was completely

16   homeless.  I didn't even have a pot to pee in. The only clothes

17   I had on were the prison sweats that I rode the bus in.  And so

18   you committed me to the halfway house for a period of six

19   months.  Within the first two months of me being at the halfway

20   house and working as a front house manager at Huey Magoo's on

21   Vaughn Road from the Harris Restaurant group, I was able to

22   accumulate enough money.  I was able to rent a nice apartment

23   at the corner of Atlanta Highway and Coliseum Boulevard.  I was

24   able to buy -- purchase a car that I would 550 a month for.  I

25   was able to get a great job with a great company, Harris

1   Restaurant group.

2         And on August 10, 2022 as Officer Johnson testified,

3   she told me actually that I had ten days to get a new job -- to

4   get a more traditional job.  That was a Wednesday.  She told me

5   I had until the following Friday.  I reported to her on Monday

6   that I was rehired by the Harris Restaurant group.  I

7   originally asked them if I could return to Huey Magoo's in the

8   front house manager, and they had said, Yes.  However with the

9   change in my financial's and having $500 a month to pay for

10  restitution and everything, I needed to make more money.  And

11  they told me that I could make more money as a lead driver at

12  Papa John's on Vaughn Road.  Everyday from that Tuesday until

13  Labor Day, which was the day before I got arrested, I worked

14  from 10:00 a.m. to 8:00 p.m. delivering pizzas on the east side

15  of town in Pike Road.  And actually, Your Honor, I made some

16  good money doing it.

17        I had -- I have a house.  I have a car.  I have a job.

18  I actually also have great health insurance through the Harris

19  Restaurant group that covers not just my diabetes but my HIV.

20  That was the medical condition that Officer Johnson was

21  alluding to that happened in June.  I was determined to be

22  positive for HIV.  My CD4 count was extremely low.  Now I'm on

23  Biktarvy for the HIV, and I have juvenile diabetes.

24        I am still eligible for health insurance through my

25  company Harris Restaurant group -- actually my Papa John's of

1    Montgomery should I return to work before October 15.  I won't

2    have been out two full pay periods.  And the health

3    insurance -- I don't remember the company off the top of my

4    head, but it covers my diabetic treatment and my HIV treatment,

5    and that Biktarvy medicine, Your Honor, is $100 a day if you

6    don't have insurance.

7            I'm telling you-all this because part of -- I know

8    that you're really big into re-entry and not recidivating, and

9    I'm not always a scammer.  I have owned what I did as a scam,

10   and I'm very sorry for all of that, and I was adamant about

11   paying my restitution and doing some community service that I

12   wasn't even assigned to.  I'm always going to be labeled a

13   scammer, Your Honor.  But one of the things you told me before

14   I went into prison was to take advantage of the programs and

15   opportunities afforded me in federal prison and to find an

16   vocation, and I found that vocation.  Paralegal.

17           Since this happened with my paralegal business, I want

18   nothing to do with criminal law.  It's tainted me.  I'm not

19   going to ever write another motion ever again as pertaining to

20   criminal law.  If I want to exercise the skills in paralegal,

21   there are so many ways that I could get a legitimate paralegal

22   job working for an attorney.  I could go to the Bar association

23   and get the addresses of every lawyer on McDonough and Court --

24   Court Street and find somebody that's going to hire me to do

25   case law research.  Nobody likes to do case law research.  If I

1  wanted to do that, I could.  Or work for a title firm or any

2  one of those companies.

3          Your Honor, over the last 35 days in the county jail,

4  I've thought of all of these things.  And I know because I keep

5  up with this kind of stuff and I read a lot, I know with

6  Class C violations there are a lot of different things that you

7  could do.  And while the Court -- while the Government would

8  love to see me locked up for 24 more months, one of the things

9  you really wanted me to do -- one of the things you committed

10  me to the halfway house for was to get my own place and my own

11  car, which I have right now, and the health insurance, which I

12  have right now, but I will lose the car if I don't make a

13  payment by the 15th.  I will lose the job.

14          And even if you sentenced me to 3 or 6, or 9 months,

15  the argument could be made that I could go to the halfway house

16  and come out and do the same thing over again.  But the big

17  difference is I will have a brand-new repo on my credit, and I

18  will have a brand-new -- brand-new eviction on my credit, and

19  I'm not going to be able to get a place to live, and I make

20  really good money driving for pizza company.

21          If given the opportunity, what I would like you to

22  consider doing, Your Honor -- and I prayed about this -- is I

23  would like you to consider sentencing me to time served and

24  either you can -- in a Class C violation, you can restart my

25  probation, restart my supervised release, or add more.  One of

1  the things that's happened here in my case, Your Honor, is I
2  got out of prison 23 months early, and I came out of prison
3  like a bull on speed, and I've never done a drug in my life.  I
4  wanted everything, and I wanted it right then and right there
5  and right now.  And I can't have it right then, right there,
6  and right now.  So that's why I say I would love for you to
7  consider sentencing me to time served and either restarting my
8  supervised release for three years starting from today or
9  adding 23 additional months to my supervised release and making
10  my supervised release end in January of '27, which is when it
11  would have ended had I actually gotten out of prison on time.
12        But the biggest -- I learned three -- I learned a
13  bunch of stuff while I've been locked up for the last 35 days.
14  The first thing that I learned is that I'm 100 percent
15  accountable to this Court to you, Your Honor, and your agent,
16  my probation officer, Officer Johnson.  100 percent
17  accountable.  If she says jump, I need to say, How high?  She
18  would never in a million years ask me to do something that was
19  unethical or not for the betterment of me.  In fact, I know
20  Officer Johnson doesn't want her probationers to go back to
21  prison.  She wants them to re-enter successfully.
22        The next thing I learned is that I -- there used to be
23  gray areas in my life, Your Honor, and there's a lot of gray
24  areas in a lot people's lives.  But because of the $1.9 million
25  fraud, because I've been on HBO and other documentaries and

1    people know who I am; there are no gray areas with me.  No

2    means no and every synonym of no also means no.  And instead of

3    trying -- if Officer Johnson gives me a directive, instead of

4    trying to find ways around that directive, I need to embrace

5    the directive and say, Officer Johnson is telling me this for

6    this reason, and this is going to help me stay out of prison

7    for good.  That's why I want you to sentence me or give me more

8    time on probation.

9            Now, I know if you were to do that, Your Honor, and I

10   were to ever come back here on another violation, you would

11   throw the book at me.  I would absolutely expect that, but

12   that's also what's called for in Section 7(b)(1)(B) of the

13   guidelines manual.  It says, that if reinstating my probation

14   is what you do, then the next time I mess up I'm gone for good.

15   And I completely get that, and I won't.

16           I will be working 50 to 60 hours every week.  I will

17   find -- I will continue with my therapy.  I have a great

18   therapist, Dr. Kale Kirkland, and I will continue my medical

19   treatments.  And speaking of my medical treatments and medical

20   insurance, the diabetes that I've had since I was a kid is

21   beginning to take my big toe on my right foot.  I'd show this

22   Court, but everybody is getting ready for dinner, and it's

23   disgusting.  I showed my lawyer a couple of times he's come to

24   visit, the toe is turning Gangrene.  The toe nail is completely

25   gone.  And you know a hang nail hurts like a -- hurts like the

1    dickens, but I don't feel a thing because of the neuropathy.

2    It's most likely going to need to be amputated in the next

3    couple of months, and it's a procedure I would love to do at

4    home with my own doctor where my family could come and visit.

5         Please, Your Honor, have mercy on me and let me show

6    you -- because the one thing that I've learned -- the most

7    important thing that I've learned is to follow the

8    instructions.  And even if we come out of this and I'm still

9    forbidden talk to Cody, I won't talk to him because as much as

10   I love him, my freedom is way more important to me and my

11   health is more important to me.

12        I filed three different compassion release motions --

13   all of them were before I was diagnosed with HIV by the way.

14   But I filed three different compassionate release motions.  The

15   jail and prison is nowhere for somebody with the health

16   conditions like I've had.  I've been begging for them to treat

17   this toe, and they haven't done it.  But that's on me for

18   ending up there, and I will never ever end up there again.

19        I said earlier in this that I was taught that by

20   Officer Johnson that, you know, apologies are just words.  I'd

21   like to have the opportunity to show you the action.  I'm so

22   tired of burning my hand on the stove, Your Honor.  And just

23   for the record, since that October -- or August 15 email, I've

24   done everything that I was supposed to do.  And, you know, the

25   whole thing is built on trust, and I do trust my probation

officer for the most part.  She told me that I was coming to

see her to fill out a mental health form.  That's why I came.

I would have been better prepared with my house and my car had

I known I was being arrested.  She told me that she was going

to do the violation.  She was going to let me know so I could

make my preparations.  She told my mom I was going to be

arrested and let go and not do any time.  I understand why that

wasn't done, though.

        But, Your Honor, please -- one of the things that you

really drive home is re-entry and recidivism, and I have a

house right now.  I have a car right now that I worked really

hard for.  I have a great job, health insurance.  And at 46,

I've got the health conditions of a 80-year-old man, and those

health condition are going to take me one day if I'm not too

careful.  So for the interest of my health, my safety, my

re-entry, and the fact that now I am laying roots -- oh, I

didn't say this as part of my thing I was going to say -- what

I do plan on doing is working 40 to 50 hours per week,

continuing with my therapist, going to see my doctors at River

Region, finding counseling -- CBT counseling, which is

cognitive behavior therapy in places like the Family Life

Center, and I am really excited about starting a budgeting

class that's offered by Church of the Highlands.  It's

something that I really need.

        In addition to that, I don't have time to get anything

1    else but if Officer Johnson is concerned or if the Court is

2    concerned about me having a computer, I have no objections to

3    even going to the halfway house for a few months because it

4    allows me to continue to pay on my house.  I have no objections

5    surrounding my computer to Officer Johnson.  The only thing I

6    do need is my phone with the GPS because I'm a pizza driver.

7    Other than that, Your Honor, I promise you I will never end up

8    here again, and this is not just talk.  I've started to show

9    it, and I'll continue to show it.

10          Officer Johnson is welcome to pop in on me anytime,

11   look at my phone, my computer -- or I'll release the computer

12   to her, even go to the halfway house.  But, Your Honor, if I

13   don't do something soon, I'm going to lose everything I tried

14   in vain to start, and I know -- I know how serious this is.  I

15   spent 35 days in the county jail.

16          Now, if you sentence me to anything that's not the two

17   years that they want, I most likely do that time in the county

18   jail and you know as well as I do that it's overcrowded, under

19   staffed, and offers nothing in the way of physical health,

20   mental health, or behavioral therapy.  I can get all of those

21   on the street starting tomorrow -- I can go back to work

22   tomorrow and work 14 hours tomorrow if I would like to and see

23   my doctors as well.

24          Thank you for listening to me.  I mean everything that

25   I said.  If you have any questions, feel free to ask.

1                    THE COURT:  Okay.  Thank you.

2                    Ms. Johnson, what do you say?

3                    PROBATION OFFICER:  Mr. Sandler has proven himself to

4       be -- to not be amenable to supervision.  I recall back to a

5       statement he stated to me that no means go.  And in his world,

6       if he's given a no, he pushes and pushes until he gets the go.

7       He has fought me tooth and nail, and there's nothing else to

8       give on his behalf.  We'll comply whatever the Court orders,

9       but he's not amenable to supervision.

10                   THE COURT:  You alluded to it but did not go into it

11      his stay with Dismas.  What was the problem with Dismas?

12                   PROBATION OFFICER:  The problem with Dismas was that

13      he didn't like the rules.  Like he stated, he's a researcher.

14      He looked up the rules and anything that he felt like didn't

15      apply to him, he would bring it to the attention of the

16      director and counselors at Dismas.  And in return, they would

17      contact me.  And they would ask me, and it was a barrage of not

18      just him but others.  And so if he's told something and he

19      doesn't like it, he pushes and he continues to push.

20                   THE COURT:  Did the rules at Dismas apply to him?

21                   PROBATION OFFICER:  The rules applies to everyone.

22                   THE COURT:  And your instruction that he follows the

23      rules of Dismas?

24                   PROBATION OFFICER:  Absolutely.

25                   THE COURT:  Did he follow the rules of Dismas?

1           PROBATION OFFICER:  Within measure, which is one of

2      the reasons why I let him go to Florida to give everyone a

3      break.  It's probably not the best decision, and I told him

4      that, and I will tell anybody that.  But when you are poking

5      and poking and poking to get what you want, it's just a series

6      of just nonstop barrage of words and emails and text messages

7      to get what you want.  I told Mr. Sandler time and time again

8      what he stated was absolutely true.  His words mean nothing.

9      I've asked over and over for changed behavior.  That's the only

10     thing I ask.  I don't need him to apologize for anything that

11     he's ever done.  All I've asked for time and time again was

12     changed behavior.  And in emails, he would apologize for his

13     manipulative behavior.  He would apologize for, you know, going

14     too far.  I didn't want the apologies.  I just wanted changed

15     behavior.  And the only way I got changed behavior in part was

16     doing the correctional interventions.  But still even to an

17     extent, that still was not enough because when the business was

18     shutdown and he returned to the office, he felt as if we took

19     it too far.

20          I've always told him to exercise his right because he

21     knows how to write motions, and I told him -- and, Your Honor,

22     you've seen them because he's written motions on multiple

23     occasions prior to supervised release and after supervised

24     release.  And when he doesn't like what he does, he just

25     continues.

```
 1            THE COURT:  When I allowed him to leave Dismas early,
 2   did you have -- had you been told that there was a plan in
 3   place that he was going to stay with -- I believe I read that
 4   he was going to stay with a county commissioner or a city
 5   counsel person's property, was that part of the --
 6            PROBATION OFFICER:  Leading --
 7            THE COURT:  -- impetus to get him out and that he had
 8   a plan?
 9            PROBATION OFFICER:  Leading up to me writing the
10   status report to the Court, his plan was that he had procured a
11   residence with city councilman and that that residence would
12   not be available until the beginning of May.  He proposed that
13   he would stay at hotels on a weekly basis until that particular
14   residence became available.  In an effort to show good faith,
15   that if I give you something, that you will continue to comply
16   and to cease some of the emails, that was the plan.  The day
17   after he got out, the plan had changed.  He wanted a transfer
18   of supervision down to Florida.  That was okay.  But what --
19   what went too far was he wanted to transfer, put in the
20   transfer, and immediately wanted to say, get me down there in a
21   week.  I have a job.  I need to go there.  Contact Florida.  Do
22   it.  Do it.  Do it.  I need to go.  I need to go.  Give me a
23   weekday pass.  Give me -- give me a pass for five days.  Give
24   me a pass for seven days.  I'll take the bus back.
25            When I said that his transportation was unreliable,
```

1  that was only in part.  There was a many -- there was plethora

2  of reasons why I did not want him to immediately go to Florida

3  based off of their rules, but transportation was one of them.

4  His way around it was, let me go get a car.  So if I get a car,

5  then you'll let me go.  Let me go.  Let me go.  I've got a car.

6  It just was -- it never stops.

7          THE COURT:  Okay.  Thank you.

8          Mr. Sandler, if you would stand with your lawyer,

9  please.

10          All right.  I know it's a Government agreement, and

11  that's the reason I did it.  It was a (c)(1)(C) agreement.  But

12  I always had concerns about 74 victims -- or 71 depending on

13  how you count -- and 32 of them wrote letters, which I've never

14  had happen, wrote letters about how you basically flimflammed

15  them out of large sums of money.  A lot of them were retirees.

16  One was even a young teenager, as I recall, and I recounted in

17  Documents 62 and probably Document 79 during -- after your

18  sentencing some of those things.

19          You got out -- you only got a lower sentence than I

20  thought was probably appropriate, but I did it because the

21  Government agreed to it, but you also got out early.  23 months

22  early.  You have abused the grace of the Bureau of Prisons, of

23  the Government generally.

24          Now, I hear the arguments, but I'm -- once I have

25  revoked you, I can consider any information in deciding what is

1    a reasonable sentence.  There's no restriction on the

2    information that I can receive.  To argue that this was one

3    mistake is contrary to the evidence.  What is abundantly clear

4    from the evidence is that you failed to follow the instructions

5    of your probation officer.  She works for me.  She works for

6    all of the judges in this court.  And she is trained to deal

7    with prisoners, but I'm not sure she's trained to deal with

8    anyone like you.  I don't believe you're amenable to

9    supervision.

10             THE DEFENDANT:  I am, Your Honor.  I'd like to be able

11    to show you.

12             THE COURT:  One thing that I told you you didn't quote

13    back to me is that the truth about us may be what we say or it

14    may not be what we say.  The truth about us is what we do, and

15    in this case, don't do.

16             So I've considered all of the 3553(a) factors that

17    apply here.  I've considered your history and characteristics.

18    I've considered the need to promote respect for the law, which

19    I don't believe you believe that fire will burn with respect to

20    this Court; the seriousness of your conduct; the need to

21    protect the public; the need to avoid unwarranted sentencing

22    disparities.  I've considered all of that and all of the

23    circumstances around here, and I also considered the

24    recommendation of the probation officer.

25             This is not just one mistake.  This is a course of

1  conduct.  It's a course of conduct and disrespect of the law,

2  of the officers of the Court, and of the Court itself.  I

3  commend what you did in prison to get all of these

4  certificates.  I commend you being a staff cook.  I commend a

5  lot of good things that you do, but you're not amenable to

6  supervision because you're going to do what you want to do.

7  The bottom-line is, you're going to do what you want to do.

8  So --

9          THE DEFENDANT:  May I speak for a second?

10         THE COURT:  I'm not asking for comments.  You've had

11 your chance to, and you allocuted for about 20, 25 minutes.  So

12 I'm happy to hear.

13         Having considered and consulted Chapter 7 of the

14 sentencing guidelines and the arguments of counsel,

15 18 U.S.C. 3553(a) factors, the sentencing arguments, the law,

16 and the recommendation of probation, it's the judgment of the

17 Court that you're hereby committed to the custody of the

18 Federal Bureau of Prisons to be imprisoned for 23 months with

19 no term of supervised release to follow.  When you finish this

20 term you will be done.

21         Pursuant to 18 U.S.C. 3553(c)(2), the Court sentences

22 the defendant outside the advisory guideline range to the

23 nature and circumstances and continuing circumstances of the

24 offense and the history and characteristics of this particular

25 defendant.

1           Now, are there any objections to the sentence or to

2    the manner in which the Court pronounced it, first, from the

3    Government?

4           MR. ANDREU:  No, Your Honor.

5           THE COURT:  From the defendant?

6           MR. BROOKE:  Yes, Your Honor.  We would raise

7    substantive as well as procedural due process that this

8    sentence is not in accordance with what the evidence was that

9    was put before Your Honor.

10           THE COURT:  Okay.  Your objection is noted and

11   preserved for the record, but it's overruled.  The sentence is

12   ordered imposed as stated.

13           Now, Mr. Sandler, as you probably know, you have the

14   right to appeal the sentence imposed within 14 days, and if you

15   cannot afford the cost of an appeal, you may apply to proceed

16   with an appeal at no cost to you.

17           Mr. Brooke, will you continue to advise your client

18   about his rights to appeal?

19           MR. BROOKE:  Absolutely.

20           THE COURT:  Okay.  Thank you.

21           Anything further from the Government?

22           MR. ANDREU:  No, sir.

23           THE COURT:  Anything further from the defendant?

24           MR. BROOKE:  Yes, Your Honor.  I would separately move

25   the Court that upon his release from his sentence, that he be

1    ordered to pay restitution at a rate of $100 per month starting

2    60 days after he is released.  I think if you look at

3    Plaintiff's Exhibit -- I'm sorry -- Defendant's Exhibit

4    Number 1 of what he can lawfully earn that that would be an

5    appropriate restitution amount.

6          I realize that the 1.9 million is what it is, but we

7    can't get there by putting a restitution amount so high that,

8    frankly, we're encouraging a person to get that money by any

9    means possible.

10         THE COURT:  What says the Government about

11   restitution?

12         MR. ANDREU:  Your Honor, I -- the Government's

13   position is restitution was ordered at the time of original

14   sentence.  There's no reason to change that amount.  The

15   suggestion that the Court's order on restitution somehow drives

16   the criminal activity in this case, I think is inaccurate.  It

17   was -- at $100 a month, this resti- -- I mean, the odds of this

18   $2 million ever being repaid are slim to none anyway, but at a

19   rate of $100 a month, that's just not going to ever get us

20   anywhere close.

21         THE COURT:  Well, Mr. Sandler's own testimony is that

22   he's able to make good money, and if he acts honestly and tries

23   not to take money from other people except for pizzas, I'd

24   believe that's true.  I'm not going to change the restitution

25   orders, but I will give him the grace, for when he finishes his

1   sentence, that he will go back to the same schedule that he

2   originally had with it titrated up on that same timetable as

3   was in the original order, and I'll put that in the order here.

4          MR. BROOKE:  Yes, Your Honor.

5          THE COURT:  Mr. Sandler, I wish the best for you.

6   You're remanded to the custody of the United States Marshal.

7          THE DEFENDANT:  May I ask a question, Your Honor?

8          THE COURT:  No.  We're done.

9        (The proceeding concluded at 5:57 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        COURT REPORTER'S CERTIFICATE

2

3        I certify that the foregoing is a correct transcript from

4    the record of the proceedings in the above-entitled matter.

5        This 26th day of January, 2023.

6

7                        /s/ Katie Silas

8                        Official Court Reporter

9                        Registered Professional Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25